PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-1294

_____

D.E., a minor, on his behalf, by his Parents; MARIA
ENGLISH*; RONALD SHEFFY

v.

CENTRAL DAUPHIN SCHOOL DISTRICT


Maria English* and D.E.,
Appellants

*Dismissed per Clerk's 03/25/2014 Order

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 1-06-cv-02423)
District Judge: Honorable Yvette Kane
Memorandum Opinion: March 31, 2009

District Judge:  Honorable Lawrence F. Stengel

Memorandum Opinion: January 3, 2013

_____

Argued on Thursday, June 12, 2014

Before:  FISHER, VAN ANTWERPEN and TASHIMA,[**]
*Circuit Judges*.

(Filed: August 27, 2014)

Carolyn M. Hazard, Esq.
Joel Mallord  **(ARGUED)**
Brian P. Savage, Esq.
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104
        *Counsel for Appellant*

Thomas A. Specht, Esq.  **(ARGUED)**
Marshall, Dennehey, Warner, Coleman & Goggin
P.O. Box 3118
Scranton, PA 18505
        *Counsel for Appellee*

_____

        [**]The Honorable A. Wallace Tashima, Senior Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

D.E., now 23 years of age, was a minor diagnosed with a learning disability and enrolled in school in the Central Dauphin School District ("Central Dauphin"). D.E.'s parents, Maria English and Ronald Sheffy, claimed that while D.E. was enrolled in Central Dauphin he was deprived of a free appropriate public education ("FAPE"), in violation of the Individuals with Disabilities Education Act[1] ("IDEA"), and that he was discriminated against based upon his various disabilities, in violation of the Americans with Disabilities Act[2] ("ADA") and the Rehabilitation Act of 1973[3] ("RA"). The District Court dismissed D.E.'s IDEA claims, and later granted summary judgment in Central Dauphin's favor as to the ADA and RA claims. For the reasons set forth below, we will affirm in part and reverse in part.

I.

A.

---

[1] 20 U.S.C. § 1400, *et seq.*
[2] 42 U.S.C. § 12132.
[3] 29 U.S.C. § 794.

3

D.E. attended school in Central Dauphin from kindergarten to the seventh grade.[4] Prior to his entrance into the school district, D.E. was enrolled in preschool at the Capital Area Intermediate Unit ("CAIU"). There, D.E.'s parents completed an early intervention referral form for purposes of a speech/language evaluation. On that form, they indicated that D.E. had "attentional concerns." After undergoing several evaluations, CAIU determined that D.E. was eligible for early intervention services and placed D.E. in speech and language therapy.

When D.E. began his transition into Central Dauphin in June 1995, his school file indicated that he was entering the school district with an individualized education program ("IEP") to address his speech and language issues. In spite of that, D.E. was not placed in any specialized courses. Three months later, D.E.'s mother signed a form permitting the school district to evaluate D.E. Seven months after receiving permission, Central Dauphin conducted the evaluation. The only test conducted at that time was for speech and language therapy. The resulting comprehensive evaluation report ("CER") and subsequent IEP thus contained only speech and language goals. The CER described D.E. as a pleasant, friendly, outgoing child who got along well with other children and appeared to have self confidence. His report card for that school year, however, indicated that he was having considerable difficulty academically. By the end of

---

[4] According to D.E. and his family, Central Dauphin's alleged statutory violations occurred throughout the entirety of his tenure with the school. Because neither party appears to dispute the facts found in the hearing officer's decision, the following facts are drawn largely from that decision.

his kindergarten year, he had not acquired the skills necessary to move on to the first grade and had to repeat his kindergarten year.

Within one month of the start of D.E.'s repeat kindergarten year, in approximately September of 1996, his mother initiated a request for another evaluation. The CER was completed on December 13, 1996, and identified D.E. as having a learning disability and as in need of specially designed instruction. That CER did not include recommendations for learning support services or address the "attentional concerns" raised by D.E.'s parents or any other impairments. D.E. was then placed in a learning support resource room where he received speech and language therapy. His new IEP was completed on December 17, 1996 and contained learning support goals and objectives, as well as recommendations for speech and language services. D.E.'s parents approved of these recommendations. Despite the changes in placement and services, D.E.'s teacher indicated at the end of his repeat year in kindergarten that he was still not performing academically at grade-level.

D.E. started his first-grade year at Central Dauphin in the Fall of 1997. At that time, his IEP was modified to recommend that he be placed in a full-time learning support room, which his parents approved. Following that change, however, D.E.'s behavior became more erratic. His parents, concerned by this change in behavior, obtained both wrap-around services and therapeutic support staff ("TSS") to attend school with him. D.E.'s parents continued to have concerns and, in April 1998, had D.E. evaluated by an external medical provider, Pinnacle Health Services ("Pinnacle"). Pinnacle diagnosed D.E. as having borderline retardation, extreme difficulties with visual and motor skills, and bi-polar disorder. Pinnacle administered the Wechsler

Intelligence Scale for Children ("WISC"), which measures a child's general cognitive abilities, and ultimately recommended that D.E.'s cognitive performance be closely monitored and re-evaluated by Central Dauphin within the next year.

Central Dauphin did not reevaluate D.E. for cognitive ability, as Pinnacle had recommended, but did administer an additional Wechsler Independent Achievement Test ("WIAT"), which provides a comprehensive measure of a student's basic scholastic skills. That evaluation report included results from the WIAT scale and Pinnacle's WISC results. During that evaluation, Central Dauphin also determined that D.E. needed emotional support services.

D.E. entered the second grade in 1998 in a full-time learning and emotional support program. During the school year, D.E.'s second grade teacher expressed concern about whether D.E.'s TSS was necessary. The TSS was later discontinued. At some point during his second grade year, D.E. began regressing behaviorally. As a result, D.E.'s mother requested an additional evaluation. The re-evaluation was completed by D.E.'s teacher, who expressed concerns about D.E.'s academic goals and placement. D.E.'s behavioral issues increased and he was eventually diagnosed with depression. Central Dauphin did not provide D.E. with a behavior support program or conduct an additional assessment.

D.E.'s IEP was modified again in third grade to read "seriously emotionally disturbed," a classification usually associated with mental retardation. As a result, D.E. was placed in a Life Skills Support program, which focused on providing additional support geared towards children with a diagnosis of mental retardation. He was later mistakenly

6

identified as having mental retardation. No adaptive behavior assessment was completed. D.E. remained in the Life Skills Support Program throughout the third and fourth grades. When D.E.'s mother realized D.E. was identified as mentally retarded, she filed a complaint and withdrew D.E. from the program. In response, Central Dauphin apologized to D.E.'s parents, found the designation error, fixed it, and advised D.E.'s mother of the change. Later that year, D.E. was also inaccurately found to be ineligible for other extended school year services.

In 2001, D.E.'s IEP was changed to recommend that he participate in regular education courses for his fifth-grade year, with an emphasis on his specific learning disability. The very next year, however, D.E.'s goals and the specially designed instruction regarding his behavior and social issues were dropped from the IEP without explanation. To further compound that error, D.E. was again found ineligible for extended school year services.

D.E.'s seventh grade IEP goal was to increase his math skills to a fourth-grade level. However, D.E.'s seventh-grade teacher was not trained in any research-based math instruction and she did not maintain any records demonstrating D.E.'s progress on the IEP goal. During that same year, the team responsible for overseeing D.E.'s IEP delayed the process while awaiting a new evaluation report. That delay resulted in D.E. working under an expired IEP for three months. The new CER, once received, failed to assess in detail D.E.'s emotional and behavioral needs. In addition, although the new CER identified issues with D.E.'s social skills, the resulting IEP never addressed that area, and Central Dauphin never conducted any follow-up in the form of classroom observations or curriculum-based assessments.

Beginning in eighth grade, Central Dauphin convened a meeting with D.E.'s parents where they reviewed the previous IEP and an evaluation report. D.E. moved from Central Dauphin shortly thereafter. Following the move, D.E.'s parents requested a due process hearing with Central Dauphin to determine whether D.E. had been provided a FAPE during his time in Central Dauphin.

## B.

The administrative hearing was held in January and February of 2006 before an impartial hearing officer. At the

conclusion of that hearing, the hearing officer found that Central Dauphin had violated both the IDEA and the RA during D.E.'s time with the school district. The hearing officer further concluded that D.E. had been denied a FAPE for all eight years while at Central Dauphin and that Central Dauphin knew D.E. had more needs than those answered by speech and language therapy upon his entry into the school district for his first year of kindergarten.

In an order dated March 23, 2006, the hearing officer awarded D.E. compensatory education in the amount of "one hour for each hour of each school day for each year he attended [Central Dauphin and] . . . fifteen hours for each of six weeks for missed summer programs for the years from 2000 to 2004." App. at 171. The award went on to note that D.E.'s parents "may decide how the hours should be spent," with some limitations, and that reimbursement for the services would be "at the rate that the parent is obligated to pay, [and] not [at] a district determined rate." *Id.* Finally, the award noted that "[s]hould the parties agree, [Central Dauphin] may set up a fund with a set dollar amount that the parent may draw upon for educational services and equipment." *Id.* Neither party appealed the hearing officer's order.

On December 18, 2006, D.E. and his parents brought an action before the District Court against Central Dauphin seeking to recover a monetary equivalent of the nearly 10,000 hours of compensatory education awarded to D.E. in the hearing officer's March 2006 order. D.E. and his parents also sought compensatory damages under the ADA, IDEA, and § 504 of the RA. In an order dated March 31, 2009, following Central Dauphin's motion for judgment on the pleadings, the District Court dismissed D.E.'s IDEA claims, citing D.E.'s failure to exhaust administrative remedies, the fact that there

9

existed no evidence that the hearing officer's order required enforcement, and due to the unavailability of damages. The District Court then denied Central Dauphin's motion regarding D.E.'s ADA and RA claims, noting that actions brought pursuant to those statutes did not require administrative exhaustion and that compensatory damages were available for those claims.

Thereafter, Central Dauphin filed a motion for summary judgment as to D.E.'s ADA and RA claims. The District Court granted the motion on January 3, 2013 after finding no evidence that Central Dauphin had intentionally discriminated against D.E. D.E. now appeals the District Court's 2009 order dismissing his IDEA claim for failure to exhaust administrative remedies, as well as its conclusion that no evidence existed that the hearing officer's order required enforcement, [5] and its 2013 order granting Central Dauphin's motion for summary judgment on his ADA and RA claims.

## II.

We note, at the outset, that a question of appellate jurisdiction potentially blocks our consideration of this appeal. We will, therefore, pause for a moment to determine our jurisdiction. *See United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("It is familiar law that a federal court always has jurisdiction to determine its own jurisdiction.").

On March 14, 2013, the Clerk's Office issued an Amended Order addressing, among other things, D.E.'s ability to pursue the instant appeal on his own behalf. The Order stated:

---

[5] D.E. has not reasserted on appeal his claim for compensatory damages under the IDEA.

10

> It is noted that Appellant D.E. is now more than twenty-one (21) years old.  Given this, the parties must, within seven (7) days of the date of this Order, advise the Court, in writing, whether D.E. is capable of prosecuting his own claims. . . .
>
> In addition, if D.E. is pursuing the appeal in his own behalf, he must personally sign the notice of appeal filed by his mother, Maria English, and return it to the Clerk's Office within fourteen (14) days of the date of this Order.  Failure to do so will result in dismissal of the appeal as to D.E.

App. at 268 (citations omitted).  The Court of Appeals docket indicates that D.E.'s signed Notice of Appeal was received on April 1, 2013, more than fifteen days later.

Central Dauphin urges this Court to dismiss D.E.'s appeal because his signed Notice of Appeal was not received within the 14-day timeframe designated by the Order.  D.E., by contrast, argues that an appellant's failure to sign a notice of appeal is curable and should not result in dismissal so long as that failure is promptly corrected, as he argues he has done here.  He directs our attention to *Becker v. Montgomery*, 532 U.S. 757, 760 (2001), a Supreme Court decision cited within the Amended Order and which he claims supports his position.  D.E. is correct.

11

It is well established "that decisions on the merits [should] not . . . be avoided on grounds of technical violations of procedural rules." *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 144 (3d Cir. 1998) (discussing Rule 3(c) of the Federal Rules of Appellate Procedure); *see also Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 858 (3d Cir. 1990) (noting that notices of appeal are to be construed liberally). Here, D.E. failed to sign and return the notice of appeal within fourteen days of the date of the Order. D.E.'s failure was cured, however, upon receipt by the Clerk's Office of the signed notice approximately four days later on April 1, 2013. The Supreme Court has made clear that an appellant's failure to sign a timely notice of appeal can be cured after the deadline to file the notice, as such a failure is curable and not a jurisdictional impediment. *See Becker*, 532 U.S. at 765-66. Because the signature requirement was curable, and D.E. did indeed cure the defect shortly after the deadline, our jurisprudence counsels in favor of exercising appellate jurisdiction over D.E.'s appeal. We therefore conclude that we have jurisdiction to review the merits of the instant appeal.[6]

III.

A.

---

[6] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

12

D.E. first challenges the District Court's grant of summary judgment on his ADA and RA claims.[7] "We review a district court's grant of summary judgment de novo, applying the same standard as the district court." *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 257 (3d Cir. 2013). Summary judgment is appropriate only where "the moving party has established 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* at 256 (quoting Fed. R. Civ. P. 56(a)). In reviewing a motion for summary judgment, all facts should be viewed "in the light most favorable to the non-moving party" and "all reasonable inferences [should be drawn] in that party's favor." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). We note, too, that in applying this standard, the non-moving

[7] Central Dauphin argues that all of D.E.'s arguments raised on appeal regarding his ADA and RA claims were not properly preserved before the District Court. We will reject this argument. "For an issue to be preserved for appeal, a party must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009) (quoting *Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 218 (3d Cir. 1999)) (internal quotation mark omitted). D.E. presented his ADA and RA arguments, including the element of intentional discrimination, a number of times before the District Court. *See, e.g.*, Brief in Opposition to Defendant's Motion for Partial Summary Judgment, D.E. v. Central Dauphin Sch. Dist., No. 1:06-cv-02423-LFS, (M.D. Pa. Jan. 27, 2012), ECF No. 90. His ADA and RA arguments were properly preserved.

13

party must overcome his own hurdle in order to withstand the motion for summary judgment. *See Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985). The non-moving party must oppose the motion and, in doing so, "may not rest upon the mere allegations or denials of his pleadings." *Id.* "[H]is response . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* "[B]are assertions, conclusory allegations[,] or suspicions" will not suffice. *Id.*

To establish claims under § 504 of the RA and the ADA,[8] a plaintiff must demonstrate that: (1) he has a disability, or was regarded as having a disability; (2) he was "otherwise qualified" to participate in school activities; and (3) he was "denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). Where, as in the instant case, a plaintiff seeks compensatory damages as a remedy for violations of the RA and the ADA, it is not enough to demonstrate only that the plaintiff has made out the prima facie case outlined above. *S.H.*, 729 F.3d at 261. He or she must also demonstrate that the aforementioned discrimination

---

[8] The same standards govern both the RA and the ADA claims. *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009).

14

was intentional. *Id.* A showing of deliberate indifference satisfies that standard. *Id.* at 263.[9]

To satisfy the deliberate indifference standard, a plaintiff "must present evidence that shows both: (1) *knowledge* that a federally protected right is substantially likely to be violated . . . , and (2) *failure to act* despite that knowledge." *Id.* at 265 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). "Deliberate indifference does not require a showing of personal ill will or animosity toward the disabled person." *Id.* at 263 (quoting *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (internal quotation marks omitted)). It does, however, require a "'deliberate choice, rather than negligence or bureaucratic inaction.'" *Id.* (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009)).

D.E. argues that he has demonstrated that Central Dauphin acted with deliberate indifference to his federally protected right to a FAPE. He relies heavily upon the hearing

---

[9] As an initial matter, the parties dispute whether D.E. has established a prima facie case under the RA and the ADA. The sole point of contention in that regard concerns the first element, that is, whether D.E. has adequately demonstrated that he is disabled. To the extent that D.E. seeks only compensatory damages, the relevance of this issue solely depends upon the outcome of our inquiry into the question of intentional discrimination. Because we ultimately conclude that D.E. has not demonstrated that there exists a genuine issue of material fact regarding whether Central Dauphin acted with deliberate indifference, we need not belabor our analysis with an inquiry into whether D.E. has established this element of a prima facie case under the RA and the ADA.

officer's findings of fact in this regard, citing to various points in the administrative record which, in his opinion, demonstrate that Central Dauphin knew that it was violating his rights. D.E. directs our attention to the following findings made by the hearing officer: (1) Central Dauphin's placement of D.E. into restrictive learning environments during his first and second grade years following certain evaluations that he considered to be lacking, as well as his subsequent misclassifications and misdiagnoses; (2) the failure of his IEPs to address ADHD concerns and his language-based learning disabilities; (3) Central Dauphin's placement of D.E. into a regular kindergarten classroom without an IEP and the seven-month delay in his first evaluation following his mother's request; (4) Central Dauphin's incorrect designation of D.E. as "ineligible" for extended school year services; and (5) Central Dauphin's failure to respond to concerns raised by his second and fourth grade teachers regarding his classroom placement and classification. These findings do not point to deliberate indifference.

To begin, the findings relied upon by D.E. largely relate to errors with the implementation of his IEP and certain classifications assigned to him following his evaluations. Without more, these errors fail to demonstrate that Central Dauphin *knew* that it was misclassifying and/or misdiagnosing D.E. We have stated this point before: "The relevant inquiry is knowledge, and evidence that the School District may have been wrong about [a student's] diagnosis is not evidence that the School District had *knowledge* that it was a wrong diagnosis. Nor does evidence that the School District's evaluation processes were defective bear on our analysis." *S.H.*, 729 F.3d at 266. D.E. appears to suggest in his brief that Central Dauphin ignored the evaluation and recommendations conducted by Pinnacle in 1998; however,

in the same breath, he concedes that Central Dauphin relied upon the Pinnacle findings in order to misclassify D.E. D.E.'s argument in this regard fails to acknowledge the fact that, although Central Dauphin did not conduct the exact tests recommended by Pinnacle, it did indeed administer additional testing – the WIAT – the results of which it incorporated with Pinnacle's test results into the new CER. D.E.'s arguments demonstrate, at best, possible defective evaluation processes, which, of course, have no bearing on the question of knowledge.

Similarly unavailing are the points raised by D.E. regarding Central Dauphin's incorrect designation regarding extended school year services and the delayed evaluation during his first year in the district. Both allegations are premised upon what Central Dauphin *should have known* rather than what it actually knew. *Id.* at 266 n.26 ("Deliberate indifference requires *actual knowledge*; allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference."). There is nothing to suggest, in either instance, that Central Dauphin's actions constituted anything more than negligence or poor decision-making. *Id.* at 263 (deliberate indifference requires a "deliberate choice, rather than negligence or bureaucratic inaction" (quoting *Loeffler*, 582 F.3d at 276) (internal quotation marks omitted)).

The strongest argument D.E. makes with respect to knowledge are the concerns raised by a few of his teachers regarding his performance and placement. But even that argument is flawed, as there are several instances in the record in which D.E.'s parents approved of his IEPs and subsequent placements, including his placement in full-time learning support. By contrast, the record reveals only one instance in which D.E.'s parents disapproved of his placement

17

and classification – when Central Dauphin incorrectly identified D.E. as mentally retarded. However, even if we were to proceed to the second prong of the deliberate indifference test on that point alone, we would have no basis to conclude that Central Dauphin failed to act on this knowledge, because Central Dauphin immediately issued an apology to D.E.'s parents, found the designation error, fixed it, and advised D.E.'s mother of the change.

The fact of the matter is that each year D.E. was enrolled in the school district, Central Dauphin provided D.E. with special education and other related services through the completion and implementation of CERs and IEPs. While the points raised by D.E. are most certainly unfortunate, we cannot agree that those findings are sufficient to withstand a motion for summary judgment on the question of deliberate indifference, particularly as to Central Dauphin's knowledge. For these reasons, we must affirm the District Court's grant of

summary judgment in favor of Central Dauphin as to D.E.'s ADA and RA claims.[10]

## B.

D.E.'s second argument challenges the District Court's dismissal of his IDEA claims for failure to exhaust administrative remedies and due to its conclusion that no evidence existed that the hearing officer's order required enforcement. Our review of a Rule 12(c) motion to dismiss is

---

[10] In his brief, D.E. relied heavily on a non-precedential opinion from our Court – *Chambers v. School District of Philadelphia Board of Education*, 537 F. App'x 90 (3d Cir. 2013) – to support his position that there was a genuine dispute of material fact regarding whether Central Dauphin was deliberately indifferent. We reject D.E.'s reliance on that opinion. Aside from the fact that it is non-binding on our Court, the facts of that case differ significantly from this one. The school district in *Chambers* had been informed of the student's needs at various points and was ordered to provide certain services, but failed to follow through on those orders. *Id.* at 96. There was also evidence in the record that the school district caused certain delays and failures in the student's educational therapy resulting from the school district's outright refusal to guarantee payment for the services. *Id.* And finally, among other things, the school district caused extended delays in response to requests by the plaintiffs for hearings regarding these failures. *Id.* We acknowledge that there is certainly a fine line between mistakes and deliberate indifference, and we could even go so far as to call this case a "close call" (as we did in *Chambers*), but the facts of D.E.'s case are simply not egregious enough to satisfy us that a genuine issue of material fact exists as to whether Central Dauphin was deliberately indifferent.

plenary. *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 253 (3d Cir. 2004). We "view[] the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the plaintiff." *Id.* (quoting *Leamer v. Fauver*, 288 F.3d 532, 535 (3d Cir. 2002) (internal quotation marks omitted)). A Rule 12(c) motion "should not be granted unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law." *Id.* (internal quotation mark omitted).

D.E. specifically argues that, at the time he filed his lawsuit, the administrative process in Pennsylvania only allowed appeals in circumstances where a party objected to the hearing officer's decision. Because he prevailed at his hearing and was ultimately awarded damages, D.E. contends that he had no reason to file an administrative appeal. Even still, D.E. points out that it was not until after the applicable timeframe for an appeal had passed that he truly became an aggrieved party as a result of Central Dauphin's refusal to work with him and his parents regarding his award. D.E. further argues that the District Court misconstrued his specific request for relief. He contends that his claim merely seeks an equitable remedy that will guarantee him the services to which he is entitled and which neither he nor his parents can otherwise afford; not, as the District Court concluded, an attempt to rewrite the hearing officer's award. D.E. notes that to base the availability of a remedy under the IDEA on whether a student or his parents are able to front the costs of such remedies is inconsistent with public policy principles underlying the IDEA.

Central Dauphin argues, in contrast, that we should affirm the District Court's dismissal of D.E.'s IDEA claims in their entirety. According to Central Dauphin, the plain

20

language of the hearing officer's decision and order gave D.E. and his parents the responsibility to determine and initiate compensatory education services, and made Central Dauphin responsible for only reimbursements of any such services once attained. Central Dauphin asserts that D.E. was fully aware of the foregoing and still failed to appeal the decision despite his alleged inability to front the costs for the services. Central Dauphin further notes that the exhaustion requirement may be set aside only in certain circumstances and that D.E. failed to argue that any of those exceptions apply to his case. For that reason, Central Dauphin also contends that D.E.'s argument has been waived for failure to preserve it before the District Court. Finally, in further support of its position, Central Dauphin asserts that, to the extent that D.E. seeks to enforce or rewrite the hearing officer's decision, the federal courts have no jurisdiction.

*(1)*

In order to resolve the issues presented by the parties, we must first address the District Court's conclusion that D.E. sought to rewrite, rather than enforce, the administrative decision. The District Court concluded that "the plain language of the order gives the parents the responsibility of determining and initiating the compensatory education services and makes [Central Dauphin] responsible for paying for those services at face value once they have been attained." *D.E. v. Cent. Dauphin Sch. Dist.*, No. 1:06-CV-2423, 2009 WL 904960, at *5 (M.D. Pa. Mar. 31, 2009). Based upon that interpretation of the hearing officer's award, the District Court concluded that there was no evidence to support D.E.'s contention that the order needed enforcement or that Central Dauphin had failed to compensate them for services for which they had previously paid. We disagree with that conclusion. While it is true that the hearing officer's award contemplates

21

reimbursement for services paid for by D.E.'s parents, it also states that, "[s]hould the parties agree, [Central Dauphin] may set up a fund with a set dollar amount that the parent may draw upon for educational services and equipment." App. at 171. The inclusion of this language within the award demonstrates that the hearing officer clearly envisioned the method of payment that D.E. seeks to obtain here. Of course, the parties must agree to set up the fund, but it remains true that the hearing officer's award did contemplate such a remedy.[11]

The inclusion of the fund language in the hearing officer's award also demonstrates that Central Dauphin and D.E.'s parents were to work *together* for the benefit of D.E. going forward. Indeed, it is more likely that the hearing officer intended that the parties work together to create the fund that D.E. seeks, than to give Central Dauphin an option to *not* agree to set up a fund. The District Court and Central Dauphin ignore this point, and instead base their conclusions largely on the portion of the order that calls for reimbursement. This interpretation, however, which places all of the responsibility on D.E. and his parents to remedy Central Dauphin's failures under the IDEA, is contrary to the very purpose of the statute, which is to provide a *remedy* for those denied a FAPE. *See D.F. v. Collingswood Borough Bd.*

---

[11] The sentence preceding the aforementioned language states that "[t]he hours are not to be used for college tuition, unless the parties both agree." One could argue that the next sentence, the sentence at issue, only applies to the ability to set up a fund for purposes of college tuition. However, given the nature of the award (completely favorable to D.E.), a fund is something that was likely envisioned as a remedy for Central Dauphin's violations.

22

*of Educ.*, 694 F.3d 488, 497 (3d Cir. 2012) ("To comply with the IDEA, a school district no longer responsible for educating a child must still be held responsible for its past transgressions. Were we to uphold the District Court's ruling, we would create an enormous loophole in that obligation and thereby substantially weaken the IDEA's protections."). D.E. specifically alleges that he is being denied this remedy, as Central Dauphin is unwilling to cooperate with him to create the fund envisioned by the hearing officer. This allegation is certainly reinforced by Central Dauphin's interpretation of the award – that it was *only* required to reimburse for services *already attained* by the student and his parents.

The gravamen of D.E.'s complaint is that he cannot afford to front the costs of the services that Central Dauphin was obligated to have provided him for free under the IDEA, and which they failed to do. Our Court, as well as several others, has recognized that the availability of IDEA remedies should not depend upon whether a student or his parents have the financial means to front the costs of those remedies. *See, e.g.*, *id.* at 498 (holding that a claim for compensatory education is not rendered moot by an out-of-district move, even if that move takes the child out of state because, to hold otherwise, would particularly impact low-income special needs students); *Reid v. District of Columbia*, 401 F.3d 516, 522-23 (D.C. Cir. 2005) ("[W]ere it impossible to obtain an award of the [compensatory] instruction itself, children's access to appropriate education could depend on their parents' capacity to front its costs – a result manifestly incompatible with IDEA's purpose of ensuring that *all* children with disabilities have available to them a [FAPE]." (internal quotation marks omitted)); *Lester H. v. Gilhool*, 916 F.2d 865, 873 (3d Cir. 1990) ("[W]e conclude that Congress, by allowing the courts to fashion an appropriate remedy to cure

23

the deprivation of a child's right to a [FAPE], did not intend to offer a remedy only to those parents able to afford an alternative private education."); *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986) ("We cannot agree with the defendants that they should escape liability for these services simply because [plaintiff] was unable to provide them in the first instance; . . . We are confident that Congress did not intend the child's entitlement to a *free* education to turn upon her parent's ability to 'front' its costs.").  The District Court, in adopting and applying Central Dauphin's interpretation of the hearing officer's award, made D.E.'s access to a FAPE dependent upon his family's ability to front the costs of his compensatory education award.

In sum, the District Court had within its power to formulate an appropriate remedy that would effectuate the purpose of the IDEA *and* the hearing officer's award.  Instead, the District Court interpreted the hearing officer's award in a manner inconsistent with public policy principles underlying the IDEA, and effectively provided Central Dauphin a way to escape liability for its past IDEA violations by refusing to "agree" with D.E. and his family to set up a fund for purposes of obtaining the educational services to which he was clearly entitled.  We cannot uphold such an interpretation, as doing so would "create an enormous loophole" in a school district's obligations under the IDEA, while "substantially weaken[ing] the IDEA's protections" for students in D.E.'s position.  *D.F.*, 694 F.3d at 497.  We therefore conclude that the District Court erred in finding that D.E.'s claims sought to rewrite, rather than enforce, the administrative decision.

*(2)*

Since we have concluded that D.E. did indeed seek to enforce the hearing officer's order, we must resolve a question

24

of first impression, that is, whether a party seeking to enforce a favorable decision from an administrative due process hearing must exhaust administrative remedies before filing suit in a court of law.

The IDEA "is a Spending Clause statute that seeks to ensure that all children with disabilities have available to them a [FAPE]." *Schaffer v. Weast*, 546 U.S. 49, 51 (2005) (internal quotation mark omitted). The statute "'leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, [but] imposes significant requirements to be followed in the discharge of that responsibility.'" *Id.* at 52 (alteration in original) (quoting *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 183 (1982)). "The core of the statute, however, is the cooperative process that it establishes between parents and schools." *Id.* at 53. The statute places significant emphasis on a parent's involvement in the disabled child's education, and requires the school to maintain contact with the parents throughout the entire process. *Id.* If a parent is displeased with the school's actions with respect to the FAPE provision, the IDEA provides for certain procedural safeguards available to children with disabilities and their parents. *See* 20 U.S.C. § 1415(a).

One such procedural safeguard is the right of those aggrieved by violations of the IDEA to a due process hearing before an administrative official. *See id.* at § 1415(b); *see also S.H.*, 729 F.3d at 257 (noting that a child or a parent who claims violations of the IDEA can file a complaint with a due process hearing officer). "[A]ny party aggrieved by the findings and decision rendered [by the administrative official] may appeal such findings and decision to the State educational agency." 20 U.S.C. § 1415(g)(1). At the final stage of the aforementioned enforcement procedure, the

25

IDEA permits any aggrieved party to bring a civil action in state or federal court. *Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 275 (3d Cir. 1996); *see also* 20 U.S.C. § 1415(i)(2). There, the court will "review[] the records of the administrative proceedings, hear[] additional evidence at the request of [either party], and grant[] . . . relief as may be appropriate." *Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994); *see also* 20 U.S.C. § 1415(i)(2)(C).

As noted above, the IDEA grants subject matter jurisdiction to the federal district courts. *See Komninos*, 13 F.3d at 778. The language of the IDEA makes clear, however, "that Congress intended plaintiffs to complete the administrative process before resorting to federal court." *Id.* This includes the process detailed above, participation in a due process hearing and, where appropriate, an appeal to the state educational agency. 20 U.S.C. § 1415(g)(1). The Supreme Court has noted as much regarding administrative exhaustion under the IDEA:

> [A]llowing an equal protection claim without requiring exhaustion under the predecessor statute, would not only "render superfluous most of the detailed procedural protections outlined in the statute, but, more important, it would also run counter to Congress' view that the needs of handicapped children are best accommodated by having the parents and the local education agency work together to formulate

26

an individualized plan for each handicapped child's education."

*Komninos*, 13 F.3d at 778 (quoting *Smith v. Robinson*, 468 U.S. 992, 1011-12 (1984)). It follows, then, that in order to give effect to these important purposes, courts must enforce the rules of exhaustion. It bears noting, however, that there are four exceptions where exhaustion would be unnecessary. Those recognized by this Court include situations where: (1) exhaustion would be futile or inadequate; (2) the issue presented is purely a legal question; (3) the administrative agency cannot grant relief; and (4) exhaustion would cause severe or irreparable harm. *Id.* Absent the existence of any of those exceptions, failure to exhaust will deprive a federal court of subject matter jurisdiction.

Here, neither party disputes that D.E. failed to appeal the hearing officer's findings and decision. However, D.E. contends that there was no need to appeal since he won at his due process hearing in all regards. According to D.E., once a party receives a completely favorable administrative decision, there is nothing left to appeal administratively. We agree. Two cases from the Fourth and Ninth Circuit Courts of Appeals provide support for this conclusion. *See Porter v. Bd. of Trs. of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064 (9th Cir. 2002); *Robinson v. Pinderhughes*, 810 F.2d 1270 (4th Cir. 1987).

In *Porter*, for example, parents of an autistic public-school student brought an action against the school district under the IDEA and § 1983, alleging failure to comply with an administrative order of compensatory education for the student. *Id.* at 1068. The district court dismissed the parents' complaint for want of jurisdiction, ruling that the parents

were required to exhaust California's complaint resolution process ("CRP"), a procedure distinct from the IDEA's due process requirements, before filing suit in court. *Id.* at 1066. The Ninth Circuit disagreed, holding that: (1) further exhaustion of California's due process procedures enacted to comply with § 1415 of the IDEA would be futile, and (2) the parents were not required to exhaust California's CRP. *Id.* In so holding, the Ninth Circuit reasoned that "[o]nce a due process hearing issues an order that is not appealed by either party, the IDEA requires that the order be treated as 'final.'" *Id.* at 1071 (citing 20 U.S.C. § 1415(i)(1)(A)). The Court concluded that the "clear congressional demarcation [in § 1415] of an end point to the due process procedures" supported its position that "[n]o other administrative procedures [were] required to be exhausted." *Id.*

While *Porter* is slightly distinguishable from the instant matter in that California's IDEA due process procedure is "one-tier," [12] the case raises an interesting point regarding finality in the statutory language. The language clearly states that any decision made at an impartial due process hearing "shall be final," except where a party appeals the decision. *See* 20 U.S.C. § 1415(i)(1)(A). In situations where neither party appeals, that administrative decision

---

[12] California's hearing system is known as a "one-tier" system because the initial hearing is conducted by the state education agency. When D.E. initiated his due process hearing, Pennsylvania operated under a "two-tier" hearing system, in which the initial hearing was conducted by the local education agency, the decision of which either party could appeal to the state education agency. *See* 20 U.S.C. § 1415. Pennsylvania has since moved to a one-tier system. *See* 38 Pa. Bull. 3575.

becomes "final and binding under the IDEA" and, as a result, nothing is left to be exhausted administratively. *Porter*, 307 F.3d at 1069. The Fourth Circuit Court of Appeals has stated the same:

> [T]he plaintiffs in our opinion have received a final administrative decision under the [IDEA]. The [IDEA] provides that "any party aggrieved by the findings and decision" of a local hearing officer may appeal to the state educational agency. A hearing decision that is not appealed is final. Contrary to the district court's holding, the plaintiffs had neither the responsibility nor the right to appeal the favorable decision by the local hearing officer since they were not aggrieved by his decision. They had exhausted all administrative remedies available to them under the [IDEA]. When the city did not appeal the local decision, it became the final administrative decision of the State.

*Robinson*, 810 F.2d at 1272 (citations omitted).

As *Porter* and *Robinson* make clear, administrative exhaustion of a favorable decision is futile and barred by the express language of the statute in that only "aggrieved

29

parties" may appeal. For those reasons, we now hold that a party seeking to enforce a favorable decision from an administrative due process hearing need not exhaust administrative remedies before filing suit in a court of law.

As relevant to the instant case, D.E. received a favorable decision at the administrative level, and neither party sought an appeal thereafter, rendering the hearing officer's decision "final and binding under the IDEA." *Porter*, 307 F.3d at 1069. For D.E., the favorable decision left him with nothing to appeal. He had, therefore, exhausted his remedies as far as the administrative process was concerned. It was error for the District Court to dismiss D.E.'s IDEA claim for failure to exhaust administrative remedies.[13]

*(3)*

The fact that D.E. was not an "aggrieved party" for purposes of administrative exhaustion raises the question of whether his claim can properly be pursued under the IDEA.

---

[13] Central Dauphin argues that D.E. waived any argument regarding administrative exhaustion because he failed to argue that any of the exceptions to exhaustion apply to his case before the District Court. Given our conclusion here, that argument is meritless. Even if we were to consider Central Dauphin's claim of waiver, D.E.'s argument, even before the District Court, has always been that he had no reason to appeal from the hearing officer's decision because he won on all accounts. *See* Brief in Opposition at 12, D.E. v. Central Dauphin Sch. Dist., No. 1:06-cv-02423-LFS, (M.D. Pa. May 7, 2008), ECF No. 29 ("Contrary to the contorted logic of the Defendants, Plaintiffs had nothing to appeal."). This is, essentially, an argument in futility.

30

Section 1415(i)(2) provides for a right of "[a]ny party *aggrieved by the findings and decision*" of the administrative proceedings to bring a civil action in state or federal court. 20 U.S.C. § 1415(i)(2) (emphasis added). This language necessarily implicates a jurisdictional issue for both this Court and the District Court, as D.E. received a favorable decision at the administrative level. We must now determine whether an individual who seeks to enforce a favorable administrative decision in court is an "aggrieved party" for purposes of § 1415(i)(2).

We explicitly left that question open in *Jeremy H*. *See* 95 F.3d at 278. There, the plaintiffs' complaint sought, among other things, to enforce elements of the state administrative decision. *Id.* We acknowledged that "there may be some question whether this aspect of the complaint [could] properly be pursued under [the IDEA]." *Id.* We ultimately found it unnecessary to resolve the question in the context of the case, but set forth the competing arguments in a footnote:

> The argument against the applicability of [§ 1415(i)(2)] would be that the [plaintiffs], in seeking judicial assistance to enforce portions of the IDEA administrative decision, were not persons "aggrieved by the findings and decision" within the meaning of [§ 1415(i)(2)], but rather persons aggrieved by the failure of the local school officials to implement the decision. The counter-argument would be that the [plaintiffs] were "aggrieved"

31

> by the fact that the administrative orders favorable to the Hunters contained no enforcement mechanisms.

*Id.* at 278 n.10.

Since the *Jeremy H.* decision, only the Court of Appeals for the First Circuit has definitively decided the question at issue, adopting reasoning similar to the latter argument noted in *Jeremy H. See Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 116 (1st Cir. 2003) (concluding that a disabled student and his parents qualified as "parties aggrieved" under the IDEA, even though they prevailed at their administrative hearing, where the school district neither appealed nor complied with its continuing obligations under the administrative order). There, the First Circuit focused largely upon Congress's intent, noting that "Congress could not have intended to leave plaintiffs without an IDEA statutory remedy when they succeed before the hearing officer and the school system does not appeal the administrative decision but simply fails to fulfill a continuing obligation to provide services." *Nieves-Marquez*, 353 F.3d at 116. The Court went on to state that, "[i]t cannot be that a court is powerless under IDEA to issue injunctive relief" given the same facts. *Id.* To do so, the Court concluded, "would open a gaping hole in IDEA's coverage" and "would create incentives for school systems to drag out the administrative process, not to appeal administrative orders, not to announce their intentions to refuse to comply with those orders, and generally not to comply." *Id.*

The Ninth and Tenth Circuit Courts of Appeals have reached similar conclusions in similar contexts. *See Porter*,

307 F.3d at 1069-70 ("It is also clear that it would be futile to bring a complaint to the [hearing officer] alleging the failure to implement a due process hearing order . . . . Thus, we conclude that the [plaintiffs'] complaint alleges a violation of the IDEA for which further exhaustion . . . would be futile . . . , allowing them to bring their claim directly to court."); *Miller v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1243 (10th Cir. 2009) (adopting the conclusion in *Nieves-Marquez* to conclude that a preemptive challenge on a speculative theory of noncompliance by the school district was inappropriate because the plaintiff could return to court to enforce the award from the administrative proceedings).

Finally, *Dudley v. Lower Merion School District*, 768 F. Supp. 2d 779 (E.D. Pa. 2011), a case from the Eastern District of Pennsylvania, also sets forth a particularly persuasive argument in favor of jurisdiction over IDEA claims of enforcement. There, as in the instant case, the plaintiffs sought an order compelling the school district to implement certain aspects of the hearing officer's order which were favorable to them. *Id.* at 782. The school district argued that the district court lacked subject matter jurisdiction under the IDEA. *Id.* The district court rejected the school district's argument, concluding that the plaintiffs were "aggrieved" for purposes of the IDEA and could bring their claim of enforcement to court. *Id.* at 783. In so holding, the court noted that:

> The IDEA is a comprehensive remedial scheme which is intended to provide a judicial remedy for violations of any right relating to the identification, evaluation, or educational placement of [a]

33

child, or the provision of a [FAPE] to such child.

. . . .

It would be anomalous indeed to read the IDEA as omitting a judicial remedy where a party is successful before a hearing officer but the School District refuses to carry out the decision. That party is as much aggrieved as in the circumstances where the administrative ruling is adverse. In both cases, the relief sought has not been realized.

*Id.* (first alteration in original) (internal quotation marks omitted).

Both *Dudley* and *Nieves-Marquez* focus largely upon the lack of an enforcement mechanism in the IDEA for parties who prevail at the administrative level, but are later faced with a noncompliant school district. We believe that the circumstances here, especially in light of the IDEA's purpose, warrant the same conclusion. We therefore hold that individuals seeking to enforce a favorable decision obtained at the administrative level are "aggrieved" for purposes of the IDEA and may properly pursue such claims in court. The District Court's dismissal of D.E.'s IDEA claims for failure to exhaust administrative remedies must be reversed.

IV.

For the reasons set forth above, we will affirm the order of the District Court as to D.E.'s ADA and RA claims,

34

but will reverse its order as to D.E.'s IDEA claim. In considering D.E.'s IDEA claim, "we encourage the District Court to consider any form of compensatory education proposed" in a manner consistent with the IDEA and Third Circuit precedent. *See D.F.*, 694 F.3d at 498-99 (setting forth a non-exhaustive list of potential forms of compensatory education awards).