**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 20-1054, 20-1055, 20-1137
_____

TARA SCOTT; WILSON CARTER, individually and as Trustee of the Bailey Middleton
Carter 2009 Trust, The Mary Wilson Carter 2009 Trust, and the Wilson M. Carter 1988
Trust
Appellants in No. 20-1137

v.

VANTAGE CORPORATION; VANTAGE ADVISORY MANAGEMENT, LLC;
VF(X) LP; TRADELOGIX, LLC; BRIAN ASKEW; and GERALD FINEGOLD

Brian Askew,
Appellant in No. 20-1054

Gerald Finegold,
Appellant in No. 20-1055
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-17-cv-00448)
Magistrate Judge: Hon. Mary Pat Thynge
_____

Submitted under Third Circuit L.A.R. 34.1(a)
December 15, 2020
_____

Before: GREENAWAY, JR., SHWARTZ, and FUENTES, <u>Circuit Judges</u>.

(Filed: February 5, 2021)
_____

OPINION[*]
_____

SHWARTZ, Circuit Judge.

Tara Scott and Wilson Carter ("Plaintiffs") sued Vantage Corporation

("Vantage"), its corporate officers Brian Askew and Gerald Finegold, and several related

entities (collectively "Defendants"), for alleged misconduct arising from Vantage's stock

offering. Because the District Court did not err in (1) granting Defendants' summary

judgment motion, (2) denying Carter's motion to substitute parties, and (3) permitting at

trial evidence concerning contract formation in connection with Defendants' breach of

contract counterclaims, we will affirm.[1]

I

Defendants created a proprietary trading software and, in 2014, formed Vantage to

trade securities using that software. Finegold was the President, Vice President,

Treasurer, and a Director of Vantage. He also prepared materials for and met with

potential investors. Askew was Vantage's Managing Partner, Head Principal, and a

Director, and he marketed Vantage stock and recruited investors. Matthew Dwyer helped

Askew and Finegold to identify investors. Dwyer received compensation from VF(x), a

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.
[1] The proceedings were automatically stayed against the Vantage entities when they filed for bankruptcy in May of 2018, see 11 U.S.C. § 362, so the District Court's summary judgment ruling and the trial verdict resolved claims only as to Askew and Finegold. Accordingly, in the context of those determinations, "Defendants" refers to the individual defendants.

hedge fund and general partner of a Vantage subsidiary. Dwyer also purchased Vantage

shares, as did fifteen others.

In April 2015, Vantage filed an SEC Form D, announcing its intent to sell

unregistered securities under SEC Rule 506(b). Later that year, Carter met with Askew

about investing in Vantage, and Askew explained Vantage's investing software. Carter's

accountant also met with Askew, who confirmed that the investment involved stock

purchases, not a partnership interest. Carter then bought $1 million of stock personally,

$1 million of stock in his capacity as Trustee for the Wilson M. Carter 1988 Trust, and

$500,000 of stock each for his two daughters, Mary Carter and Bailey Carter.

Carter told Scott about the Vantage investment and he arranged for her to meet

with Askew. After that meeting, Scott invested $2 million. Plaintiffs never met or spoke

to Finegold before investing in Vantage. In total, Vantage raised about $8 million from

sixteen investors during its 2016 stock offering.

When Carter and Scott bought their shares, they understood the securities were

unregistered, illiquid, and only being offered to accredited investors. [2] For instance, the

Stock Subscription Agreement stated that "[Vantage] is relying upon certain exemptions

---

[2] An accredited investor is a "person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1 million," or someone with "an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year." 17 C.F.R. § 230.501(a)(5)-(6). "Any entity in which all of the equity owners are accredited investors" is also an accredited investor. Id. § 230.501(a)(8). An investor is also accredited under Regulation D if "the issuer reasonably believes" the investor satisfies those requirements. Id. § 230.501(a).

from the registration requirements of the Securities Act and any applicable state securities laws and that such reliance is predicated in part upon the truth and accuracy of the statements made by the undersigned in this Stock Subscription Agreement." App. 3286. By signing that Agreement, Plaintiffs represented, among other things, that they had the "knowledge and experience" to understand "the merits and risks" of their investments, had enough resources to "bear th[at] risk," understood the securities were unregistered, and that there was no public market for their shares. App 3246-47. They also received a Term Sheet "outlin[ing] the terms and conditions of a proposed offering by Vantage Corporation of shares of its class A common stock to accredited investors," which explained that "[t]he Shares are being offered only to accredited investors as defined under the Securities and Exchange Commission's [SEC] Regulation D." App. 3228. The Term Sheet also noted that proceeds from the stock offering would "be used to execute [Vantage's] proprietary trading strategy and for working capital and other general corporate purposes." App. 3228.

Scott and Carter were accredited investors. When Scott bought Vantage shares, her net worth excluding her home was $2.8 million. When Carter bought them, his net worth was $29 million. As to Carter's stock purchases for his daughters, Carter told Askew that he wanted to purchase some shares through an LLC in which he served as the sole managing member, and which owned two trusts in which his daughters were beneficiaries. Askew informed Carter that "[t]he funds can come from the entity, but Vantage can't title in an LLC. It has to be an individual or a trust. We could easily title in each girl's name. Would you like that?" App. 2108. Carter agreed and directed

4

Askew to title the shares in his daughters' names. Carter did not disclose that his daughter Mary Carter was then thirteen years old and that he had her sign the documents that represented that she understood the risks of investing and had the financial resources to bear that risk.

Scott sought to liquidate her Vantage shares because of health issues and concerns about how Defendants were handling her investment and demanded that Vantage move $1 million of her $2 million investment to VF(x), which had liquidity rights. Vantage waived the liquidity and redemption notice provisions in Scott's Stockholders Agreement and allowed her to sell $550,000 of her $2 million worth of shares. Carter also sought, but was unable, to liquidate his investment.

Plaintiffs sued Defendants, claiming Defendants violated federal and state securities laws and breached common law duties. Plaintiffs essentially assert that Defendants were not permitted to sell unregistered securities and that they made misrepresentations in connection with their sale. The District Court granted Defendants' summary judgment motion on all but one of Plaintiffs' claims,[3] which a jury ultimately rejected by delivering a defense verdict.

Defendants also asserted several counterclaims arising from Plaintiffs' alleged breach of their respective Stockholders Agreements. In defending against those

---

[3] The District Court denied both parties' summary judgment motions and tried Count III, which alleged that Askew violated Ga. Code. Ann. § 10-5-31 by selling securities without registering them with the Georgia Commissioner of Securities.

5

counterclaims, the Court permitted Plaintiffs to depart from the pretrial order and present contract formation arguments. The jury rejected the counterclaims.

Plaintiffs appeal the District Court's summary judgment order and order denying Carter's motion to substitute parties. Finegold appeals the Court's amendment of the pretrial order.

## II

We will first examine the order granting Defendants' motion for summary judgment. We review a district court's grant of summary judgment de novo. Cranbury Brick Yard, LLC v. United States, 943 F.3d 701, 708 (3d Cir. 2019). We view the facts and make all reasonable inferences in the non-movant's favor. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A

In Counts I and II, Plaintiffs allege that Defendants unlawfully sold unregistered securities because they failed to comply with certain requirements that exempted them from the SEC's registration requirements.

In general, securities must be registered in order to be sold. The SEC, however, has promulgated rules that permit the sale of unregistered securities. Among other things, to be exempt from the registration requirements under Regulation D:

- The offeror may not engage in general solicitation. 17 C.F.R. § 230.502(c).

6

- There must not be more than thirty-five unaccredited investors in the offering. Id. § 230.506(b)(2); see also id. § 230.501(e) (clarifying that only unaccredited investors count towards the thirty-five-investor limit).
- Each unaccredited investor must have the necessary experience to evaluate the risks and merits of the investment. Id. § 230.506(b)(2)(ii).
- If there are unaccredited investors who purchase stock, the issuer has certain disclosure obligations. Id. § 230.502(b)(1)-(2).
- "Bad actors" cannot promote the stock or solicit investments. Id.§ 230.506(d).

The issuer bears the burden of demonstrating it qualifies for the exemption. See SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953); SEC v. Cavanagh, 155 F.3d 129, 133 (2d Cir. 1998). Defendants have met that burden.

First, Defendants did not engage in general solicitation as defined by Rule 502(c). The record reflects that Vantage sought investments from friends, family, and friends of friends. Thus, the opportunity to invest in Vantage spread through a small word-of-mouth network and did not have the far reach of a general solicitation campaign.[4]

Second, because Vantage only had sixteen investors in the offering, there were necessarily fewer than thirty-five unaccredited investors. See 17 C.F.R. § 230.506(b)(2); id. § 230.501(e).

Third, by signing the Stock Subscription Agreement, each investor represented that he or she had such knowledge and experience in financial and business matters to enable them to evaluate the merits and risks of the investment. Because each investor signed those documents, Vantage could reasonably conclude the investors could evaluate

---

[4] Scott testified that, in July 2016, she witnessed Askew solicit business from two women on the street. This solicitation, however, related to a separate capital raise for a hedge fund, which occurred after the Vantage offering had closed. She also argues that Vantage solicited her investment without a prior relationship, but the record shows that Carter introduced her to, and arranged for her to meet with, Askew.

and tolerate the risks.  Cf. Wright v. Nat'l Warranty Co., 953 F.2d 256, 260 (6th Cir. 1992) (rejecting argument that Regulation D exemption was unavailable because securities were sold to unaccredited investors when investors "specifically warranted and represented in the subscription agreement . . . that they were accredited investors").

Fourth, because Defendants had reason to believe that both Mary Carter and Matthew Dwyer were accredited investors, they had no special disclosure obligations to them.  See 17 C.F.R. § 230.501(a) (defining accredited investor to include persons "who the issuer reasonably believes" are accredited).  If either Mary Carter or Matthew Dwyer been unaccredited investors, then disclosures would have been required to permit Vantage to retain its exemption.  Based on this record, however, no reasonable juror could find that Defendants lacked a reasonable basis to believe that both were accredited. Vantage provided each purchaser with a Term Sheet that expressly stated that the offering was available only to accredited investors.  Askew and Finegold also testified that they only sought investments from accredited investors.  Moreover, as to Mary Carter, her father facilitated the purchase of the shares placed in her name.  Defendants knew he was a wealthy, sophisticated investor who was aware that the offering was only open to accredited investors.  He also used funds from an LLC, in which he is the sole managing member to purchase the shares.  Furthermore, although the shares were titled in Mary's name, she was not the purchaser,[5] and thus the investment did not trigger

---

[5] In addition, Mary Carter was not the investor.  An investor is "[a] buyer of a security or other property who seeks to profit from it without exhausting the principal." Black's Law Dictionary (11th ed. 2019).  Mary Carter did not buy Vantage stock,

8

disclosure requirements.  See 17 C.F.R. § 230.502(b)(1) (requiring disclosures to "purchasers" of stock who are unaccredited investors).

Dwyer too understood the offering was open only to accredited investors and bought shares with that knowledge.  He accepted the Term Sheet, which included the representation that Vantage was offering "shares of its class A common stock to accredited investors."  App. 3296.  He also told Askew that he was an accredited investor and testified that he was an accredited investor at the time he bought Vantage shares.  Thus, Defendants had a reasonable basis to believe that he was accredited and his purchase did not require disclosures.

Fifth, contrary to Plaintiffs' assertion, Defendants do not lose the exemption under Rule 506's "bad actor" provision.  A "bad actor" is: (a)  "any promoter" or "any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities" (b) who is "suspended or barred from association with a member of . . . a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade."  17 C.F.R. § 230.506(d).   If a "covered person" was suspended or barred before September 23, 2013, then the offeror must disclose such facts to investors before it may sell the stock.[6]  Id. § 230.506(e).

---

Carter's LLC did.  Since Mary Carter was not the investor, she was not an unaccredited investor under Rule 502.

[6] If such a disqualifying event occurred on or after September 23, 2013, then the entity may not rely on Regulation D's registration exemptions.  See Sec. & Exch. Comm'n, Disqualification of Felons and Other "Bad Actors" from Rule 506 Offerings

9

Not all "bad actors" are "covered persons."  Covered persons include those who promote a stock or solicit investments.  A promoter is a person who (1) "directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer" or (2) "in connection with the founding and organizing of the business or enterprise of an issuer, directly or indirectly receives in consideration of services or property, or both services and property, 10 percent or more of any class of securities of the issuer or 10 percent or more of the proceeds from the sale of any class of such securities."  17 C.F.R. § 230.405.  Solicitors include persons compensated for soliciting investments.  Id. § 230.506(d).

Plaintiffs contend that Dwyer was a "bad actor" because he was permanently banned from "associat[ing] with any FINRA member firm in any capacity," App. 2921, before September 23, 2013, and Defendants did not disclose this information to investors.  Dwyer, however, is not a "covered person."  First, Dwyer does not fit the definition of a promoter because there is no evidence he was involved in the founding or organizing of Vantage or that he received compensation in connection with that founding.  Second, there is no evidence that Vantage compensated Dwyer for soliciting investments in Vantage.  The record shows that only Vantage Asset Management LLC, a Vantage subsidiary, paid Dwyer for raising money for VF(x).  Because Dwyer was not compensated for soliciting investments in Vantage, Vantage had no disclosure

_____

and Related Disclosure Requirements (Sept. 19, 2013),
https://www.sec.gov/info/smallbus/secg/bad-actor-small-entity-compliance-guide.htm.

obligations and his past misconduct did not disqualify Vantage from privately offering unregistered securities under Regulation D.[7]  See 17 C.F.R. § 230.506(d).

B

Count IV alleges that Vantage violated Section 12 of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), by making material misrepresentations in connection with an offering of its securities.  Section 12, however, does not apply to private sales.  See Gustafson v. Alloyd Co., 513 U.S. 561, 578 (1995) ("The intent of Congress and the design of the statute require that § 12(2) liability be limited to public offerings.").  Because Vantage's offering was private, the District Court properly granted Defendants' summary judgment motion on Count IV.

C

In Counts VIII, IX, and X, Plaintiffs allege that Defendants made material misrepresentations in violation of federal, state, and common law.  The District Court granted Defendants' summary judgment motion on those claims finding, among other reasons, that even if Defendants had made material misrepresentations, the misrepresentations did not cause Plaintiffs' economic loss.  We agree.

Section 10(b) and Rule 10b–5, Georgia's securities laws, and Delaware common law all require a securities plaintiff to prove that a material misrepresentation or omission

---

[7] Plaintiffs' claim that Vantage violated Georgia law also fails because Defendants offered securities under Regulation D, and, as such, it is "a federal covered security" under Georgia law and exempt from state registration requirements.  See O.C.G.A. § 10-5-20(1).

11

was "a substantial factor in causing the . . . economic loss." McCabe v. Ernst & Young, LLP., 494 F.3d 418, 429 (3d Cir. 2007); see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008) (noting § 10(b) and Rule 10b–5 claims require proof of loss causation); Holmes v. Grubman, 691 S.E.2d 196, 200-01 (Ga. 2010) (applying federal loss causation standard to securities fraud claims brought under Georgia law). Plaintiffs failed to make such a showing.

Plaintiffs assert that Defendants misrepresented Vantage's financial circumstances at the time Plaintiffs invested, but they have failed to show how those alleged misrepresentations caused them an economic loss.[8] In addition, Plaintiffs have not adduced evidence showing that Vantage's bankruptcy or the SEC investigation they initiated were not the cause of their loss nor have they shown that the latter did not impact Defendants' ability to raise capital.

Because Plaintiffs have not adduced evidence showing a causal connection between their economic loss and Defendants' statements or omissions, the District Court correctly granted Defendants' summary judgment motion on Counts VIII, IX, and X.

D

In Counts V and VI, Plaintiffs allege that Defendants breached their fiduciary duties and their common law duty of care. The District Court granted summary judgment

---

[8] Moreover, even if Vantage was "essentially insolvent" before Plaintiffs invested, Appellees' Br. 41, this fact aligns with the purpose of an initial capital raise. In addition, Plaintiffs' contention that Vantage misused some of the investment proceeds to pay employees is undermined by the fact that Term Sheet contemplates such usage and, in any event, Plaintiffs failed to show how such an allocation of capital caused them any economic loss.

12

on these claims in Defendants' favor because Plaintiffs' brief provided no explanation of how those duties were breached. The Court observed: "The entirety of their answering brief is two sentences; one making an unsupported conclusion that investor funds were improperly spent on software, the other, merely setting forth the unremarkable proposition that directors owe a fiduciary duty of disclosure to company stockholders." App. 52-53.

Plaintiffs contend that the "brevity of [their] response . . . did not relieve the [District] Court of its obligation to consider the record and determine if there was a genuine issue of material fact." Appellees' Br. 43. Plaintiffs are wrong. When a party moves for summary judgment, the non-moving party "'may not rest upon the mere allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine'" dispute as to any material fact. Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 288 (3d Cir. 2018) (quoting D.E. v. Central Dauphin Sch. Dist., 765 F.3d 260, 268-69 (3d Cir. 2014)). Moreover, a district court is not required to forage the record to make a party's case for him. See Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1029 (9th Cir. 2001) ("[A] district court is 'not required to comb the record to find some reason to deny a motion for summary judgment.'" (quoting Forsberg v. Pacific N.W. Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988))); Herman v. City of Chicago, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing.").

Because Plaintiffs failed to identify facts that demonstrate there is a dispute concerning whether Defendants breached their fiduciary or common law duty of care,

13

and the District Court has no independent obligation to hunt for these facts, it correctly

granted Defendants' motion for summary judgment on Counts V and VI.

III

The District Court also properly granted summary judgment in Finegold's favor

on all claims against him. First, Plaintiffs make no primary allegations against Finegold.

While Plaintiffs argue that Finegold made misrepresentations and solicited sales, the

record shows that they did not communicate with Finegold before purchasing Vantage

shares. Thus, Plaintiffs have not provided proof that he played a role in their stock

purchases.

Second, Finegold is not liable as a "control person." Under § 20(a) of the

Exchange Act:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Georgia has a similar provision. See O.C.G.A. § 10-5-58(g); see also

Curry v. TD Ameritrade, Inc., No. 1:14-CV-1361-LMM, 2015 WL 11251449, at *18 &

n.14 (N.D. Ga. June 30, 2015) (noting that control person liability under federal and

Georgia law are "nearly identical" and that the "inquiry is the same for purposes of

determining whether a plaintiff has established control"). Thus, Plaintiffs must prove

"not only that one person controlled another person, but also that the 'controlled person'

is liable under the [Exchange] Act." In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153

14

(3d Cir. 2004), abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007).  Because Plaintiffs have adduced no evidence showing Askew, the purportedly controlled person, violated the Act or relevant state laws, there is no basis to conclude Finegold was a "control person" liable under the federal or state securities laws.

IV[9]

The District Court also acted well within its discretion when it denied Carter's motion to substitute new parties.  Late in the litigation, Carter sought to substitute his daughters as parties in place of the trusts he established for them.  Under Rule 17, a new party may be substituted to ensure the real party in interest has his day in court.  Substitution is permitted "when determination of the proper party to sue [was] difficult or when an understandable mistake has been made."  Nelson v. Cnty. of Allegheny, 60 F.3d 1010, 1015 n.8 (3d Cir. 1995) (quoting Fed. R. Civ. P. 17 advisory committee's note to 1966 amendment).

Carter asserts that he mistakenly named the trusts as Plaintiffs rather than his daughters.  Carter, however, had direct knowledge of who purchased the Vantage stock and requested Vantage title the shares to his daughters directly.  Because Carter was aware of all of the relevant facts when he brought suit, and thus had no basis to have "mistakenly" sued using the trusts, the District Court did not abuse its discretion by denying his motion to substitute.

---

[9] We review a District Court's Rule 17 order for abuse of discretion.  See ICON Grp., Inc. v. Mahogany Run Dev. Corp., 829 F.2d 473, 476 n.3 (3d Cir. 1987).

Finegold's challenge to the District Court's departure from the pretrial order also fails. Pretrial orders "control[] the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d). "[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived," Rockwell Int'l Corp. v. United States, 549 U.S. 457, 474 (2007) (alteration in original) (citation omitted), and courts may modify a final pretrial order only to prevent manifest injustice, Fed. R. Civ. P. 16(e); Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466, 1476 (3d Cir. 1988). "The decision of whether or not to permit a change [to the pretrial order] is within the discretion of the trial judge. Appellate interference with this discretion should be kept at a minimum. It should only be exercised where there is a clear abuse of discretion." Ely v. Reading Co., 424 F.2d 758, 763-64 (3d Cir. 1970) (citations omitted). We determine whether a district court abused its discretion by considering: "(1) the prejudice or surprise in fact to the opposing party, (2) the ability of the party to cure the prejudice, (3) the extent of disruption to the orderly and efficient trial of the case, and (4) the bad faith or willfulness of the non-compliance." Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1236 (3d Cir. 1994).

Finegold correctly notes that the pretrial order did not present the issue of contract formation and that the District Court nonetheless allowed Plaintiffs to present formation theories at trial. In his opening brief, however, Finegold does not allege any surprise, inability to cure the prejudice, disruption of trial, or bad faith by Plaintiffs, and while those arguments were raised in his reply, arguments raised for the first time in a reply brief are waived on appeal. See Prometheus Radio Project v. FCC, 824 F.3d 33, 53 (3d

Cir. 2016). Thus, he has not met his "heavy burden" of showing that Court abused its discretion in permitting Plaintiffs to pursue these theories. <u>Ursic v. Bethlehem Mines</u>, 719 F.2d 670, 675 (3d Cir. 1983).[10]

## VI

For the foregoing reasons, we will affirm.

---

[10] Defendants also appealed the District Court's failure to decide their Fed. R. Civ. P. 11 motion, but the District Court notified the parties it will rule on that motion. As a result, that portion of Defendants' appeal is moot.