**PRECEDENTIAL**
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-3107
_____

APRIL NITKIN,

Appellant

v.

MAIN LINE HEALTH,
doing business as Bryn Mawr Hospital
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 2-20-cv-04825)
District Judge:  Honorable Karen S. Marston
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 27, 2023

Before:  JORDAN, KRAUSE and BIBAS, *Circuit Judges*

(Filed:  May 11, 2023)
_____

David M. Koller
Koller Law
2043 Locust Street – Suite 1B
Philadelphia, PA   19103
    *Counsel for Appellant*

Kristine G. Derewicz
Paul C. Lantis
Tanner McCarron
Littler Mendelson
1601 Cherry Street – Suite 1400
Philadelphia, PA   19102
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Appellant April Nitkin filed a lawsuit against Main Line Health, Inc. ("MLH"), alleging claims of a hostile work environment, retaliation, and wrongful termination in violation of federal and state laws.  MLH successfully moved for summary judgment on the hostile work environment and wrongful termination claims.  Nitkin succeeded on her surviving retaliation claim, but she has now appealed the District Court's order entering summary judgment against her on the hostile work environment claim.  Because the District Court correctly determined that Nitkin did not demonstrate that the harassment she experienced was severe or pervasive, we will affirm.

## I.  BACKGROUND

Nitkin, a Certified Registered Nurse Practitioner, worked in one of MLH's four hospitals from 2016 to 2019. She was a member of the palliative care team, a unit that focuses on managing the physical pain and emotional suffering of extremely ill patients.  As part of that team, Nitkin "worked with the patient's collaborating physician … [and] [o]ne such physician was … [a director of MLH's] palliative care team." (Opening Br. at 3.)

During the course of Nitkin's employment at MLH, that particular doctor (the "Lead Doctor") would lead weekly team meetings where "all the nurse practitioners, nurses, and physicians who were assigned to work that day would … discuss the patient list and pressing issues."  (Opening Br. at 3.)  But, "about once a month[,]" those meetings "would stray from work-related topics[,]" when the Lead Doctor would discuss unrelated issues "such as 'his substance misuse, history, his beliefs on treating patients with substance misuse,' his wife, his family, and his upbringing."  (Opening Br. at 3 (quoting App. at 5).)  He would also ask members of his team about their personal lives, including their dating lives and past traumatic experiences.  Nitkin testified that those discussions "looked a lot like group therapy[,]" as its attendees, including the Lead Doctor, would "[o]ften … cry during these meetings." (App. at 121.)

Nitkin explained that about half of the meetings that would stray from work-related topics would also digress into sexually inappropriate territory.  She could not describe every sexual comment that the Lead Doctor made during those group meetings, she said, "because there were so many[,]" (App. at

3

130), but she did recount five specific examples that occurred. First, Nitkin testified that, during a meeting after the holidays, the Lead Doctor mentioned that his wife, who also worked for MLH, had gifted him a candle, which he said was his "favorite, because it really sets the scene for sex." (App. at 131.) He went on to say, "I believe she gave it to me to insinuate that we were going to have sex. And that's the best gift." (App. at 131.) Second, she stated that the Lead Doctor claimed women can get "anything [they] want from [their] husbands or any man, because [they] can just withhold sex[,]" and he further said that his wife did so. (App. at 131.) Third, Nitkin stated that the Lead Doctor would complain about his prostatitis, which he claimed "was due to having sex with loose women[,]" (App. at 122) and that "his wife … [was] a loose woman, and that he had sex with loose women[,]" (App. at 131). Fourth, she testified that, during a meeting where a coworker disclosed trauma that she experienced as a young girl, the Lead Doctor told a story about how he "had a date with a woman, and she took all her clothes off and wanted to act like a tiger" but then later stated that the incident occurred "while he was baby-sitting" a young girl. (App. at 132.) The fifth event Nitkin recounted occurred when the Lead Doctor said that a hospital visitor had "big fake tits[,]" and that "women who have big tits either show them off or hide them." (App. at 134.)

Nitkin also testified about two incidents in which the Lead Doctor made her feel uncomfortable in private. Around July 2018, in the early morning, he had entered her office "look[ing] terrible." (App. at 135.) When Nitkin asked him if he was okay, he responded "that he was up all night the night before struggling with his sex addiction … and masturbation addiction, [and that he was] watching pornography all night." (App. at 136.) Nitkin then, out of fear for her personal safety,

4

locked herself in her office bathroom for several minutes until other coworkers arrived. On a separate occasion, the Lead Doctor told her that a male patient "would like to be alone with [her]. [The patient] would probably really like that." (App. at 139.) Nitkin interpreted this comment as the Lead Doctor "talking about a patient who basically wants me alone because [the Lead Doctor's] thinking about having sex with me." (App. at 139.) Nitkin admits, however, that the Lead Doctor never propositioned her for a date or stated that he wanted to have sexual relations with her.

Nitkin took several steps to distance herself from this physician. She reduced her work hours twice – first from forty hours per week to twenty-four hours per week and then to per diem work – to avoid interacting with him. She also reported his conduct to Eric Mendez, MLH's Director of Human Resources. After MLH conducted an investigation, it removed the Lead Doctor from his director role and assigned Dr. Adam Tyson as the Interim Medical Director. Despite the change in leadership, Nitkin was still assigned to work from time to time with the Lead Doctor. She explained to Dr. Tyson that she "wasn't comfortable with being scheduled at [the] Bryn Mawr [Hospital] when [the Lead Doctor] was there" and also told him that she had previously filed a complaint against that doctor. (App. at 169.) Dr. Tyson responded, "Well, then I think for everyone, we shouldn't do you being at Bryn Mawr [sic] … but let me think about that." (App. at 170.)

Shortly after that encounter with Dr. Tyson, Nitkin received a new job offer and decided to resign from MLH, effective in September 2019. Dr. Tyson, however, informed Mendez that Nitkin had divulged confidential information when Nitkin told him that she filed a complaint against the

5

Lead Doctor, which was a terminable offense per MLH's policies. According to Nitkin, Mendez told her that, if she was terminated for violating policies, he would have to inform her new employer, which could interfere with her credentialing and Nitkin's offer letter could be rescinded as a result. Mendez told Nitkin that she could avoid such an outcome if she made her resignation effective immediately, as she would not be terminated for cause. Nitkin then immediately emailed Dr. Tyson, stating that she was "writing this email to move up [her] resignation to be effective immediately." (App. at 102.)

Nitkin later filed a complaint against MLH, asserting two claims of hostile work environment on the basis of sex and retaliation for reporting the Lead Doctor's behavior to Mendez, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* She also brought parallel claims under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §§ 951 *et seq.*, which applies the same legal standard as Title VII.[1] Her fifth and final claim was for wrongful termination in violation of Pennsylvania state law.

MLH moved for summary judgment on all five claims, which the District Court granted as to Nitkin's hostile work environment and wrongful termination claims but denied with respect to her retaliation claims. In analyzing her hostile work environment claim, the Court declined to consider Nitkin's "general, unsubstantiated allegations" that the Lead Doctor's

---

[1] "Claims under the [Pennsylvania Human Relations Act] are interpreted coextensively with Title VII claims." *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

6

inappropriate "conduct occurred 'regularly' or 'all the time'" (App. at 25), focusing instead "on the seven specific incidents that Nitkin identified in her deposition testimony" (App. at 26). It found that those "seven instances, which occurred over the course of the approximately three-and-a-half years that Nitkin worked at MLH, lack the frequency necessary to establish pervasiveness." (App. at 27.) It also concluded that those seven instances were not "severe enough to support a hostile work environment claim" (App. at 27), in part because the Lead Doctor "never propositioned Nitkin for a date or sex, never touched her, and never directed sexually inappropriate comments specifically at her" (App. at 29).

Nitkin's remaining retaliation claims proceeded to trial, and a jury returned a verdict in her favor. She then timely appealed the District Court's order insofar as it granted summary judgment in favor of MLH on her hostile work environment claim.

## II. DISCUSSION[2]

To establish a hostile work environment claim under

---

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary. *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009). Summary judgment is appropriate when, construing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

Title VII, a plaintiff must demonstrate that:

> 1) [T]he employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) [there was] *respondeat superior* liability.

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). For discrimination to constitute severe or pervasive behavior, it must "alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks omitted). The Supreme Court has emphasized that "conduct must be extreme" to satisfy this standard, so "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are inadequate. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

---

of law." *Sec'y U.S. Dep't of Labor v. Kwasny*, 853 F.3d 87, 90 (3d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).

8

Nitkin contends that she has "presented sufficient evidence to establish a dispute of material fact as to whether [the Lead Doctor's] conduct was severe or pervasive enough to constitute a hostile work environment." (Opening Br. at 15.) She argues that the District Court erred when it failed to consider nonspecific instances of misconduct beyond the seven specific comments the Court discussed, and that it improperly relied on its own judgment as to the severity and pervasiveness of the misconduct instead of submitting the issue to the jury. We address those arguments in turn.

**A.**

The District Court properly disregarded Nitkin's generalized assertions of harassing conduct. Nitkin contends that the Lead Doctor made "at least twenty-one" harassing comments because she alleged that he made sexual comments during weekly team meetings "approximately once every other month during [her] three and a half [sic] year employment at [MLH]." (Opening Br. at 21 (emphasis removed).) Yet she identified only five comments about which she could give any specifics at all.

To withstand a motion for summary judgment under Federal Rule of Civil Procedure 56, "a plaintiff … must point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Although we view all facts in the light most favorable to a plaintiff opposing summary judgment and draw all reasonable inference in that party's favor, a plaintiff who reaches the summary judgment stage may no longer "rest upon the mere allegations or denials of his

9

pleadings." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268 (3d Cir. 2014) (quoting *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985)).  Nor will "[b]are assertions, conclusory allegations, or suspicions" suffice.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E.*, 765 F.3d at 269).  Instead, the plaintiff "must set forth specific facts" establishing a triable issue.  *Id.* at 288 (quotation omitted).

Here, Nitkin points to no concrete evidence to support her statement that the Lead Doctor made harassing comments on twenty-one occasions.[3]  Indeed, she admitted during her deposition that she could not describe other instances from the group meetings where anything untoward was said.  Nitkin may not rely merely on "vague statements" to defeat summary judgment.  *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quotation omitted).  Thus, the District Court properly excluded Nitkin's "general, unsubstantiated allegations that the alleged conduct occurred 'regularly' or 'all the time.'"  (App. at 25.)

**B.**

Nitkin also argues that the District Court "substituted its

---

[3] We recognize Nitkin testified that the Lead Doctor made comments about "loose women" on "several occasions" and twice referred to a young woman "t[aking] all her clothes off and want[ing] to act like a tiger."  App. at 294–95.  Courts must consider evidence that particular comments were made repeatedly.  By contrast, conclusory allegations of inappropriate remarks are inadequate at the summary judgment stage.

judgment for the judgment of the jury" in concluding what constitutes a hostile work environment. (Opening Br. at 27.) She states that the Lead Doctor's conduct altered the conditions of her employment because "[s]he was required to take part in" sexually related conversations, "was on the spot with her supervisor in her own office[,] … was brought to tears by him[,] … [and] feared him when she was alone." (Opening Br. at 28.) Her claims must rest on the seven comments that she was able to recount – the five from the group meetings and the additional two that occurred in private conversation. The District Court correctly analyzed those remarks, and there is no genuine issue of fact as to any of them.

First, we do not look to the number of incidents in a vacuum. Rather, we consider "the frequency of the [allegedly] discriminatory conduct" in the context of a given case. *Harris*, 510 U.S. at 23. As the District Court recognized, the seven comments Nitkin identified were spread out over a span of over three-and-a-half years. The relative infrequency of the Lead Doctor's remarks – reflecting one or two statements in a given six-month period – indicates that his actions were not severe or pervasive harassment. *See Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020).

We also consider the nature and severity of the misconduct, including whether it involved "physically threatening or humiliating [acts], or … mere offensive utterance[s]." *Harris*, 510 U.S. at 23. Here, although the Lead Doctor's remarks were obnoxious, unprofessional, and inappropriate, he never threatened Nitkin, touched her, or propositioned her for a date or sex.

11

The misconduct in this case is therefore a far cry from that we have previously deemed "severe" or "pervasive." *See, e.g.*, *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 428 (3d Cir. 2020) (supervisor "coerced [plaintiff] into engaging in sexual relations, shared pornography with her, asked her to film herself performing sexual acts, engaged in a pattern of flirtatious behavior, scolded her for speaking with male colleagues, [and] assigned her duties forcing her to be close to him"); *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 215 (3d Cir. 2017) (in addition to repeatedly propositioning plaintiff, her supervisor "grabbed her," exposed himself to her, and "attempted to take her shirt off"); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 146–47 (3d Cir. 1999) (supervisor told plaintiff she "made too much money" for a woman, belittled her, and "grabbed [her] buttocks from behind while she was bending over her files and told her that she smelled good").[4]

---

[4] We do not suggest that touching, threats, propositions of sex, or requests for dates, are necessary to demonstrate a hostile work environment; other verbal comments can suffice where they are sufficiently severe or pervasive. *See Harris*, 510 U.S. at 23 (holding that "no single factor is required" to show a hostile work environment, including "whether [the acts are] physically threatening"); *Mandel*, 706 F.3d at 168 (noting that courts should consider whether conduct is "physically threatening or humiliating"). Moreover, courts may look to conduct directed at individuals other than the plaintiff in determining whether a hostile work environment exists. *See Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 110 (3d Cir. 1999) (observing that a female employee's work environment may be "altered as a result of witnessing a defendant's hostility towards other women at the workplace"); *Schwapp v. Town of*

Our sister circuits have likewise held that infrequent offensive utterances are not severe or pervasive, yet permitted hostile work environment claims based on more persistent and serious harassment to proceed to trial. *Compare Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 806 (8th Cir. 2013) (affirming summary judgment when the evidence showed seven insensitive comments that "took place during a span of over three years and were relatively infrequent"), *and Patt v. Fam. Health Sys., Inc.*, 280 F.3d 749, 751, 754 (7th Cir. 2002) (affirming summary judgment when plaintiff's supervisor made eight lewd remarks "over the course of several years," because "these comments were too isolated and sporadic to constitute severe or pervasive harassment"), *with Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (reversing summary judgment when plaintiff experienced more than twelve incidents involving "fondling, kissing, propositioning," and sexual comments in "just four months"), *and Johnson v. Booker T. Wash. Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (reversing summary judgment when plaintiff was subject to "roughly fifteen separate instances of harassment over the course of four months," including crude remarks, obscene gestures, unwanted massages, and touching from behind). Thus, though offensive, the Lead Doctor's comments were not sufficiently "extreme" to create a hostile work environment. *Faragher*, 524 U.S. at 788.

---

*Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("The mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim.").

13

In light of the "totality of the circumstances," *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017), we agree with the District Court's conclusion that – even considered together – the identified incidents do not rise to a level that could fairly be called severe or pervasive and thus did not "alter the conditions of [Nitkin's] employment and create an abusive working environment,"[5] *Meritor*, 477 U.S. at 67. No rational jury, following the law, could conclude otherwise.

## III. CONCLUSION

For the foregoing reasons, we will affirm.

---

[5] As Nitkin has not shown that the allegedly harassing behavior was severe or pervasive, we need not address MLH's argument that it established the *Faragher-Ellerth* defense, which vitiates respondeat superior liability. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (holding that an employer is not liable for a hostile work environment created by one of its employees when "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and … the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise").