**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 22-3186

———————

SHERRY NORRIS,
                                    Appellant

v.

NLMK PENNSYLVANIA LLC;
SHARON COATING LLC

———————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-21-cv-00291)
Magistrate Judge:  Honorable Patricia L. Dodge

———————

Submitted Under Third Circuit L.A.R. 34.1(a)
on October 27, 2023

Before:  HARDIMAN, FREEMAN, and MONTGOMERY-REEVES, *Circuit Judges*.

(Opinion filed: March 21, 2024)

———————

OPINION[*]

———————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

MONTGOMERY-REEVES, *Circuit Judge.*

Sherry Norris appeals the District Court's order granting summary judgment on hostile-workplace, sex-discrimination, and retaliation claims that she brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII"), and the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. §§ 951–63 (the "PHRA").  The District Court properly held that the handful of offensive remarks and other conduct that Norris identified—while troubling and inappropriate—did not constitute severe or pervasive discrimination given the high bar that controlling precedent sets for hostile-workplace claims.[1]  And Norris has failed to adduce evidence that Appellees relied on pretext to justify her termination considering that joint committees formed by Norris's union and her employer concluded that Norris engaged in harassing behavior toward two co-workers, Norris attempted to interfere with an internal investigation into her own misconduct, and Norris violated other company rules.  Thus, we will affirm.

## I.    BACKGROUND

Because Norris challenges the District Court's grant of summary judgment, the following recitation of the facts resolves all disputed facts and draws all reasonable

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge under 28 U.S.C. § 636(c)(1).

inferences in her favor.  *See, e.g.*, *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 345 (3d Cir. 2022).

**A.      Norris Is Harassed**[2]

Norris worked in the shipping department for Sharon Coating, LLC ("Sharon Coating"), an entity that operated a steel mill.  She was the only woman who worked in her department.

In 2014, Mike Confer, a male co-worker, began harassing Norris on the basis of her sex.  Among other things, Confer called Norris "derogatory terms while at work, such as 'bitch,' 'cunt,' and 'whore.'" App. 1277.  Confer posted similar remarks on Facebook.

Norris reported the behavior to management, which investigated the complaint and confirmed that Confer violated the company's anti-harassment rule.  This misconduct was grounds for termination.  But rather than terminate Confer, Sharon Coating

---

[2] Some of the most troubling facts alleged by Norris were neither pleaded in her complaint nor disclosed in discovery.  Instead, they first surfaced in a declaration that Norris filed in opposition to a motion for summary judgment filed by Sharon Coating and NLMK Pennsylvania, LLC (collectively, "Appellees").  Appellees filed a motion to strike Norris's declaration under the sham-affidavit doctrine, arguing that parts of the declaration conflicted with her prior sworn testimony (including several facts we list here and in our analysis).  The District Court ultimately found the motion moot because Norris's claim failed even *with* her declaration.

suspended him for five days, transferred him to a different part of the facility for about five months, and required that he sign a last-chance agreement.[3]

**B.      The 2017 Joint Committee Cannot Substantiate Norris's Allegations that Confer Is Continuing to Harass Her**

After completing a five-month tour in a different part of the facility, Confer returned to his regular post in the area where Norris worked.  What happened next is hotly contested.  But for purposes of summary judgment, Norris adduced evidence that (1) co-workers, other than Confer, used sex-based slurs to refer to Norris on a handful of occasions, (2) Confer and another co-worker smashed a coffee cup and plastic chairs that belonged to Norris and threw away her coat or jacket,[4] and (3) someone posted "graphic pornography of a woman . . . directly next to [Norris's] locker," App. 1279.[5]  *See generally Norris v. NLMK Pa., LLC*, No. 2:21-cv-291, 2022 WL 11264627, at *1–10 (W.D. Pa. Oct. 19, 2022).

Norris complained to management that Confer "ha[d] an agenda to get her fired," App. 1012, intentionally made mistakes to make her work more difficult, discouraged

---

[3] The last-chance agreement provided that Confer "w[ould] be terminated immediately" "[s]hould it be established that [he] is involved in another charge of harassment or treats others inappropriately including any form of retaliation."  App. 1034.

[4] Norris also noticed that her phone charger repeatedly went missing after Confer worked a shift but had no evidence that Confer "actually took" it.  App. 298.

[5] Norris also claims to have noticed "persistent errors in the staging of coils in [her] area . . . when on [a] shift with or following a shift when . . . Confer worked."  App. 1279. But she did not know whether Confer made similar errors for other employees and admitted that it was common for employees to make mistakes at the steel mill.

4

other co-workers from helping her, and used slurs to refer to her. In 2017, Sharon Coating and the United Steelworkers Local 1016-15 (the "Union") formed a joint committee to investigate Norris's complaint (the "2017 Joint Committee").[6] After interviewing Norris, Confer, and 27 other witnesses, the 2017 Joint Committee unanimously concluded that it could not validate Norris's allegations against Confer. To the contrary, the 2017 Joint Committee unanimously concluded that "there are harassment type behaviors coming from [Norris] regarding . . . Confer resulting in the other employees feeling like a victim from the situation as schedules are monitored and the work environment is tense."[7]

After the 2017 Joint Committee finished its investigation, a group of managers— including Thomas Taborek, then-corporate director of human resources and labor relations for NLMK Pennsylvania, LLC—met with Norris. "[T]he goal of the meeting was to help [Norris] understand the issues and to help everyone move on from [the]

---

[6] The Union represented Norris, Confer, and other employees at the steel mill.

[7] App. 1014. For example, Norris alleged that Confer had an agenda to get her fired. There is no dispute, however, that this allegation "was not confirmed by anyone [the 2017 Joint Committee] interviewed. . . . On the contrary, several [witnesses] indicated that [Norris] had made the comment about wanting to get [Confer] fired" when she said things like, "I don't care if I lose my job as long as he does too," "[I am] not going to be happy until [Confer] [is] fired," and "[I] will not stop this until he or both of [us] are fired." *Id.*

Similarly, Norris alleged that Confer intentionally made mistakes to interfere with her work. But again, there is no dispute that the 2017 Joint Committee unanimously found that this allegation was unsubstantiated. Indeed, on one occasion, a co-worker told Norris that he had made a mistake that Norris wrongly attributed to Confer. Norris "would not believe [the co-worker]," however, "and still insisted" that Confer made the mistake. *Id.*

5

situation." App. 176. Among other things, Taborek told Norris that she needed to "let go of this twisted perception of reality that doesn't seem to be true," stop "nit-picking . . . everybody else," and "go do [her] job." App. 667.

### C. Norris Accuses Steiner of Fighting

In 2018, a supervisor ordered Norris to move some coils. When Norris left her pulpit to do so, David Steiner, a co-worker who drove trucks at the steel mill, "began screaming at [Norris] asking why [she] was moving the coils." App. 1280. Steiner and Norris were "on good terms and had a collegial working relationship." App. 1279. But this occasion caused their working relationship to sour and they "never spoke again." App. 1280.

After this event, Norris was hostile to Steiner. For example, Norris started directing Steiner to go to the wrong places while he was working, which caused other shippers to get angry with Steiner. And a joint committee later determined that Norris did not properly communicate with Steiner at work.

Norris also falsely reported Steiner for fighting on two occasions.[8] On the first occasion, Norris told a foreman that Steiner was fighting with Larry Merchant, a co-

---

[8] Norris offers explanations for why she thought that these reports were justified. But there is no dispute that these reports were false because Steiner did not get into a fight with the relevant co-worker or customer.

6

worker in the shipping department. Norris's report was false. Steiner and Merchant did not fight or have a disagreement.

On the second occasion, Norris reported that Steiner was fighting with an outside driver, effectively a customer of Sharon Coating. After hearing about the purported fight, the head of safety at Sharon Coating came "'flying up' in a golf cart." App. 186. The driver and Steiner both confirmed that they had not gotten into a fight and that Steiner had simply approached the driver to discuss the timing of pulling a truck.

### D.     Appellees Terminate Norris

On April 27, 2018, Steiner told a manager that Norris was harassing him. Among other things, Steiner said that Norris was interfering with his work and falsely accusing him of misconduct. Steiner explained that he did not want to file a formal complaint but "just wanted this info documented in case something is said regarding any of these issues in the future." App. 1121. The manager referred Steiner to the human resources department. Steiner discussed his concerns with management on a few more occasions in the following weeks and months. But he waited until August 7, 2018, to formally accuse Norris of harassment.

Sharon Coating and the Union formed another joint committee to investigate Steiner's formal complaint (the "2018 Joint Committee"). After interviewing Steiner, Norris, and 13 other witnesses, the 2018 Joint Committee unanimously concluded that "[m]ost of what . . . Steiner provided as examples of how [Norris] [was] acting towards

7

him could be validated in testimony from others" and "referred [the matter] to management for resolution."[9]

Sharon Coating suspended Norris while it decided how to resolve the matter. Three days later, on September 24, managers in the human resources department exchanged an email outlining occasions when Norris may have violated company rules. The managers did not limit their review to Norris's treatment of Steiner and considered several other issues, such as an occasion when Norris allegedly failed to timely report a work-related injury. The managers also accused Norris of "coercion" because she tried to "change people's minds and get them to be on her side" while the 2018 Joint Committee's investigation was ongoing even though Taborek forbade Norris from discussing the investigation with co-workers. App. 204.

On September 26, Sharon Coating held a discharge meeting with Norris and her union representative. During that meeting, Norris had an opportunity to respond to the

---

[9] App. 1000. The Union could not "agree to any form of discipline because [it] represents the party being disciplined." App. 199.

allegations against her. Management considered all available options but decided that termination was appropriate.

Two days later, on September 28, Sharon Coating terminated Norris. In a letter, Sharon Coating stated that Norris was being terminated for cause because she created a hostile work environment and broke other company rules.

### E. The District Court Grants Summary Judgment

After exhausting her administrative remedies, Norris filed the operative complaint in the District Court. The complaint alleged that Appellees violated Title VII and the PHRA by (1) subjecting Norris to a hostile work environment on the basis of her sex, (2) terminating Norris for misconduct that would not have resulted in termination for a male comparator, and (3) terminating Norris to retaliate against her for reporting sex discrimination.

The District Court granted Appellees summary judgment on all counts. Among other things, the Court held that Norris failed to adduce evidence of severe or pervasive harassment or that Appellees relied on pretext to justify her termination. Norris appealed.

## II. DISCUSSION[10]

Norris argues that the District Court erred by granting summary judgment on her hostile-workplace, sex-discrimination, and retaliation claims. We address each claim below.[11]

### A. The Hostile-Workplace Claim

Title VII prohibits "[s]exual harassment that creates a hostile workplace." *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). To establish a hostile-workplace claim Norris must show, among other things, that she experienced "severe or pervasive" "discrimination." *Nitkin*, 67 F.4th at 570 (quoting *Mandel v. M & Q Packaging Corp.*,

---

[10] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). This Court has jurisdiction under 28 U.S.C. § 1291.

We review the District Court's grant of summary judgment de novo. *Samuel Grossi & Sons*, 49 F.4th at 345 (citing *Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 708 (3d Cir. 2019)). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and [Appellees] [are] entitled to judgment as a matter of law." *Id.* (quoting *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020), *amended by*, 979 F.3d 192 (3d Cir. 2020)). When making that determination, "we view the facts in the light most favorable to [Norris] and draw all reasonable inferences in [her] favor." *Id.* (cleaned up) (quoting *Scheidemantle v. Slippery Rock Univ. St. Sys. of Higher Ed.*, 470 F.3d 535, 538 (3d Cir. 2006)). "We may affirm on any basis supported by the record, even if it departs from the District Court's rationale." *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019) (citing *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1089 & n.10 (3d Cir. 1988)).

[11] "Claims under the [PHRA] [generally] are interpreted coextensively with Title VII claims." *Nitkin v. Main Line Health*, 67 F.4th 565, 569 n.1 (3d Cir. 2023) (quoting *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006)). For simplicity, and because there are no relevant differences between federal and state law, the following discussion focuses on Norris's Title VII claims.

706 F.3d 157, 167 (3d Cir. 2013)). Discrimination is severe or pervasive only if it is so "extreme" that it "amount[s] to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (collecting cases). As such, "[t]he mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability." *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001) (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

Norris relies on the following incidents—which occurred during a roughly five-year period from 2014 to 2018—to show severe or pervasive discrimination: (1) on about ten occasions, co-workers used a sex-based slur to refer to Norris; (2) co-workers smashed a coffee cup and chairs that belonged to Norris and threw away her coat or jacket; and (3) on one occasion, someone posted pornography next to Norris's locker.

This Court's opinion in *Nitkin* held that similar allegations were insufficient, as a matter of law, to establish severe or pervasive discrimination. In that case, a female nurse practitioner identified seven specific instances over three-and-a-half years when a male lead doctor made inappropriate sexual comments about women generally, and the plaintiff in particular. *See* 67 F.4th at 568. Among other things, the plaintiff adduced evidence that:

- "[T]he Lead Doctor would complain about his prostatitis, which he claimed 'was due to having sex with loose women,' and that 'his wife was a loose woman,' and that 'he had sex with loose women'";

- "[D]uring a meeting where a coworker disclosed trauma that she experienced as a young girl, the Lead Doctor told a story about how he 'had a date with a woman, and she took all her clothes off and

11

wanted to act like a tiger' but then later stated that the incident occurred 'while he was baby-sitting' a young girl";

- "[T]he Lead Doctor said that a hospital visitor had 'big fake tits,' and that 'women who have big tits either show them off or hide them'";

- On an "early morning," the Lead Doctor "entered [the plaintiff's] office 'looking terrible'" and told the plaintiff "that he was up all night the night before struggling with his sex addiction and masturbation addiction, and that he was watching pornography all night." "[O]ut of fear for her personal safety," the plaintiff "locked herself in her office bathroom for several minutes until other coworkers arrived"; and

- "[T]he Lead Doctor told [the plaintiff] that a male patient 'would like to be alone with her. The patient would probably really like that.' [The plaintiff] interpreted this comment as the Lead Doctor 'talking about a patient who basically want[ed] [her] alone because the Lead Doctor[] [was] thinking about having sexual relations with [her].'"

*Id.* at 568 (cleaned up).

The Court held that these comments—while "obnoxious, unprofessional, and inappropriate"—were insufficient as a matter of law to establish severe or pervasive discrimination. *Id.* at 571–73. To arrive at that conclusion, the Court focused on "the frequency of the discriminatory conduct" and "the nature and severity of the misconduct, including whether it involved 'physically threatening or humiliating [acts], or . . . mere offensive utterance[s].'" *Id.* 571–72 (alterations in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Applying those factors, the Court held that "[t]he relative infrequency of the [male doctor's] remarks—reflecting one or two statements in a given six-month period—indicate[d] that his actions were not severe or pervasive harassment." *Id.* at 571 (citing *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d

12

Cir. 2020)).  The Court also held that "[t]he misconduct in this case [was] . . . a far cry from that we have previously deemed 'severe' or 'pervasive'" because, "although the [male doctor's] remarks were obnoxious, unprofessional, and inappropriate, he never threatened [the plaintiff], touched her, or propositioned her for a date or sex." *Id.* at 572 (collecting cases).[12]

*Nitkin* compels the conclusion that Norris has failed to adduce evidence of severe or pervasive discrimination.  The harassing conduct Norris identified occurred with "relative infrequency," *see id.* at 571, as she recounted, over a roughly five-year period, about ten occasions when co-workers used sex-based slurs, two or three occasions when someone destroyed her property, and one occasion when someone posted pornography near her locker.  Moreover, this alleged conduct—while troubling and inappropriate—did not involve "touching, threats, [or] propositions of sex," *see id.* at 572 n.4, and generally was not directed at Norris while she was present.[13]  Of course, a plaintiff need not be

---

[12] *Nitkin* clarified that "touching, threats, propositions of sex, or requests for dates[] are [not] necessary to demonstrate a hostile work environment; other verbal comments can suffice where they are sufficiently severe or pervasive," such as conduct that is "physically threatening or humiliating." *Id.* at 572 n.4 (collecting cases).  That direction does not change our analysis because Norris failed to adduce evidence of physically threatening or humiliating verbal comments for the reasons provided below.

[13] Norris asserts that "the physical destruction of [her] personal items . . . amount[ed] to physically threatening and obviously work-disrupting behavior."  Opening Br. 32.  But she neither explains why it would be reasonable to infer that this conduct was threatening nor cites any evidence or legal authorities to support that assertion in the argument section of her opening brief.

present for conduct to be harassing.[14]  And conduct can make a workplace hostile even if it was not directed at the plaintiff.[15]  But the fact that nearly all of this alleged conduct was not directed at Norris while she was present suggests that it was neither severe nor pervasive.  Norris also conceded that employees at the steel mill "were always 'stirring the pot . . .' and 'picking on' each other,'" and that male "co-workers all called each other names and made comments to each other that were not directed at [Norris]." App. 154–55.  This context suggests that co-workers were not singling out Norris in particular when they used slurs to refer to her.[16]

Accordingly, the District Court correctly held that the handful of specific alleged instances of harassment that Norris identified—while offensive and discriminatory— were insufficient, alone or in the aggregate, to establish severe or pervasive

---

[14] *See, e.g.*, *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (3d Cir. 1997) ("The mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim.").

[15] *See, e.g.*, *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 110 (3d Cir. 1999) ("[A] plaintiff may show that, while she was not personally subjected to harassing conduct, her working conditions were nevertheless altered as a result of witnessing a defendant's hostility towards other women at the workplace." (citing *Lehman v. Toys R Us, Inc.*, 626 A.2d 445, 457 (N.J. 1993))).

[16] Norris argues that *Nitkin* is not on point because "it involved much less egregious behavior that described the personal circumstances of the alleged harasser, rather than describing the alleged victim in derogatory terms." Reply Br. 7 n.1.  But at least one of the male doctor's comments in *Nitkin* implicitly described the plaintiff in sexual terms. *See* 67 F.4th at 568.  Thus, the fact that Norris has identified comments that referred to her specifically, as opposed to women generally, does not provide a basis to distinguish this case from *Nitkin*.

discrimination under controlling precedent.[17]  Thus, Appellees are entitled to summary

judgment on Norris's hostile-workplace claim.

B.      The Sex-Discrimination Claim

"Title VII forbids employers 'to fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin.'"  *Jones v. Se. Pa. Transp. Auth.*,

796 F.3d 323, 325 (3d Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)).

Sex-discrimination claims are analyzed under the three-step *McDonnell Douglas*

burden-shifting framework.  *See generally Burton v. Teleflex Inc.*, 707 F.3d 417, 425–27

(3d Cir. 2013).  Under the first step, a plaintiff must establish a prima facie case of

discrimination.  *Id.* at 426.  If a "plaintiff makes out her prima facie case, 'the burden of

production [then] shifts to the defendant to offer a legitimate non-discriminatory

[justification] for the adverse employment action.'"  *Id.* (alterations in original) (quoting

*Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009)) (citing *Simpson v. Kay

Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 n.5 (3d Cir. 1998)).  If the employer

provides a legitimate, nondiscriminatory reason for its action, "the burden of production"

"shifts . . . back to the plaintiff to provide evidence from which a factfinder could

---

[17] Norris asserts that the District Court erred by "considering each" instance of harassment "in isolation."  Opening Br. 25.  That critique cannot be squared with the District Court's opinion, which explained that the conduct Norris identified was not "sufficiently severe or pervasive" "*in the aggregate*" to establish a hostile-workplace claim.  *See, e.g.*, *Norris*, 2022 WL 11264627, at *15 (emphasis added).

15

reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.* (collecting cases).

Norris claims that Appellees engaged in sex discrimination because they would not have terminated a similarly situated male employee for engaging in the same misconduct. The parties dispute whether Norris can establish a prima facie claim of sex discrimination. We need not resolve that issue, however, because Appellees have carried their burden of production under step two of the *McDonnell Douglas* burden-shifting framework to offer a nondiscriminatory justification for terminating Norris. And Norris has failed to rebut that showing with evidence of pretext. *See generally Burton*, 707 F.3d at 426–27 (collecting cases).

To establish pretext, Norris must show that Appellees' "proffered non-discriminatory reasons" for her termination were "either a *post hoc* fabrication or otherwise did not actually motivate [that] employment action." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) (citing *Logue v. Int'l Rehab. Assocs., Inc.*, 837 F.2d 150, 155 (3d Cir. 1988)). Norris argues that she has adduced evidence of pretext for three reasons. First, Appellees purportedly "subjected Norris, the only woman in her work area, to discipline for acts [that they] permitted other, male, employees to do." Opening Br. 44. Second, "the 2018 Joint Committee [purportedly] was conducted in a peculiar manner that gives rise to a suspicion that its outcome was orchestrated to further Appellees' pretext." *Id.* Third, Appellees purportedly "had to search for a rationale to justify Norris's termination after

already having disciplined her by placing her on a five-day suspension." *Id.* But none of these points show pretext.

Regarding the first point, Norris's assertion that male employees were not disciplined for engaging in similar conduct is false. Appellees disciplined Confer for breaking the company's anti-harassment rule by suspending him, temporarily reassigning him to a different part of the facility, and requiring that he sign a last-chance agreement.

Perhaps Norris means that Appellees disciplined her more harshly than male comparators because Appellees allowed Confer to keep his job "after being deemed guilty of harassing [Norris]." Opening Br. 26. This selective-discipline argument is unavailing, however, because Norris failed to adduce evidence that Confer was deemed to have violated multiple company rules and, thus, was a proper comparator. *See In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (explaining that comparators must be "similarly[] situated in all respects" and have "engaged in the same conduct" as the plaintiff (alteration in original) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992))). In her opening brief, Norris asserts that Confer was a proper comparator because he "worked in the same department," was "employed in [a] substantially similar position[]," and also was "accused" of violating the company's anti-harassment rule. Opening Br. 41. None of the points address how Confer can be a proper comparator considering that Norris was deemed to have violated *multiple* plant rules, including by allegedly engaging in harassing behavior regarding *two* co-workers, while Confer's only

17

documented misconduct charge was his violation of the company's anti-harassment rule with respect to Norris.

On reply, Norris suggests that the Court should disregard her other alleged rule violations because they were the product of "one-sided rhetoric from the very group of people harassing and discriminating against [her]." Opening Br. 19. Again, this argument does not address how Confer could be "similarly situated in all respects" to Norris despite the lack of evidence that he was deemed to have broken multiple company rules. *See In re Tribune Media Co.*, 902 F.3d at 403. And—notwithstanding Norris's assertion to the contrary—there is no genuine dispute of material fact that Norris was deemed to have violated multiple company rules, in addition to her alleged harassing behavior regarding Steiner, when Norris allegedly (1) engaged in harassing behavior regarding Confer, (2) tried to get people to take her side while the 2018 Joint Committee's investigation was ongoing, despite being ordered not to discuss the investigation with co-workers, and (3) falsely reported Steiner for fighting with a customer.

Thus, Norris has failed to show that she adduced evidence capable of supporting a reasonable inference that Confer was a proper comparator. And, as such, there is no

reason to infer that Appellees' decision to offer Confer a last-chance agreement, but not Norris, can show pretext.[18]

Norris's second point is that the 2018 Joint Committee's formation was "peculiar" because Appellees waited more than 100 days after receiving Steiner's informal complaint to launch a joint committee. Opening Br. 44. Appellees offered a nondiscriminatory explanation for this delay: Steiner did not wish to file a formal complaint when he first reported Norris's harassment in April 2018. And Sharon Coating formed the 2018 Joint Committee after Steiner changed his mind and decided to formally accuse Norris of harassment. The District Court made this point below when analyzing identical arguments related to Norris's retaliation claim. *Norris*, 2022 WL 11264627, at *20. Norris offers no substantive response to these points on appeal and fails to cite any evidence indicating that the 2018 Joint Committee's formation deviated from past

---

[18] Norris also suggests that Steiner is a proper comparator because he allegedly spoke to co-workers about the 2018 Joint Committee's investigation while it was ongoing, but was not disciplined. Norris cites no evidence that Steiner was found to have harassed co-workers or engaged in other serious misconduct. Thus, Steiner is not a proper comparator because his alleged misconduct was materially different—in type and degree—from Norris's alleged harassing behavior regarding Confer and Steiner. *See generally In re Tribune*, 902 F.3d at 403.

practices.[19]  Thus, we see no reason to conclude that Appellees' delay in forming the

2018 Joint Committee can show pretext.

Norris's third, and final, point is that Appellees purportedly "did not have a

legitimate nondiscriminatory reason to terminate" her when they suspended her, so they

had to "search[] for additional violations . . . to buttress their already-made decision."

Opening Br. 45.  But Appellees did not need to search for a new rationale to terminate

Norris.  The 2018 Joint Committee already did that work by uncovering Norris's

treatment of Steiner, which Appellees cited as the primary reason for her termination.

Moreover, Norris fails to explain why she could not have been suspended and terminated

for the same misconduct.  Appellees' "typical procedure [was] to have a meeting" with

an employee and their union representative "[w]hen an employee is facing potential

termination."  App. 200.  Thus, there is no reason to infer anything nefarious from the

fact that Norris was suspended pending termination for engaging in the same core

misconduct.

Finally, there is no genuine dispute of material fact that Norris was found to have

engaged in nearly all of the alleged conduct that led to her termination, including falsely

accusing Steiner of fighting with a customer and trying to get people to take her side

---

[19] For example, Norris stresses that Sharon Coating did not launch a joint committee in April 2018 even though Steiner informally reported the same harassing behavior that purportedly led to Norris's suspension and dismissal.  But Norris cites no evidence that Appellees have investigated other instances of misconduct when an employee does not wish to file a formal complaint.  And Norris offers no evidence that Steiner's complaint was not genuine or that Appellees exaggerated their concern about Steiner's allegations to disguise discriminatory animus.

while the 2018 Joint Committee's investigation was ongoing.  Norris tries to explain why these actions were justified or did not warrant termination.  But the pretext inquiry is about "whether discriminatory animus motivated the employer," not whether "the employer's decision was wrong or mistaken."  *Fuentes*, 32 F.3d at 765 (collecting cases).  And Norris neither casts "*substantial* doubt" on the reasons that Appellees provided for her termination nor offers evidence that her sex factored into that decision.  *Cf. id.* at 764 n.7 (emphasis added).  Thus, the District Court did not err by granting summary judgment on the sex-discrimination claim because Norris failed to adduce evidence of pretext.

### C.    The Retaliation Claim

Norris's final claim is that Appellees violated Title VII by terminating her because she reported sexual harassment.  The *McDonnell Douglas* burden-shifting framework applies to retaliation claims under Title VII.  *See, e.g.*, *Kengerski v. Harper*, 6 F.4th 531, 536 n.3 (3d Cir. 2021).  Norris relies on the same arguments that she made with respect to the sex-discrimination claim to establish pretext for her retaliation claim.  Those arguments are unpersuasive for the reasons provided above.  Thus, Appellees are entitled to summary judgment on the retaliation claim for the same reasons that they are entitled to summary judgment on the sex-discrimination claim.

## III.    CONCLUSION

For the reasons discussed above, we will affirm the District Court's order granting Appellees summary judgment.